**SPRINGFIELD TERMINAL RAILWAY COMPANY, et al., Plaintiffs, Appellants,**

**v.**

**CANADIAN PACIFIC LIMITED, dba, CP Rail System, Defendant, Appellee.**

No. 97–1783.

United States Court of Appeals, First Circuit.

Heard Nov. 5, 1997.

Decided Dec. 22, 1997.

---

Robert S. Frank, Jr., with whom Robert M. Buchanan, Jr., Eric J. Marandett, Kenneth E. Steinfield, and Joshua A. Engel, Boston, MA, were on brief, for appellants.

Terence M. Hynes with whom Michael Fehner, Washington, DC, was on brief, for appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and STAHL, Circuit Judge.

COFFIN, Senior Circuit Judge.

This is an appeal from a summary judgment for defendant in a civil antitrust action brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, seeking damages for an "attempt to monopolize ... any part of the trade or commerce among the several States." The appeal also challenges the district court's refusal to exercise its supplemental jurisdiction over one count of the complaint charging violation of the Massachusetts Antitrust Act, Mass. Gen. L. ch. 93, § 5, and another count charging tortious interference with prospective business advantage.

### The Parties

The plaintiffs are three railroad companies owned by Guilford Transportation Industries, Inc., with principal offices in New Hampshire. They are the Boston and Maine Corporation (B & M), the Maine Central Railroad Company, and the Springfield Terminal Railway Company, which collectively comprise the Guilford Rail System. We shall refer to plaintiffs-appellants simply as Guilford. The defendant-appellee is Canadian Pacific Ltd., with principal offices in Montreal, Quebec. We shall refer to it as CP. Guilford's lines run from New England to New York; CP's relevant line runs through central Maine between the Canadian provinces of New Brunswick and Quebec.

### The Market

The market subject to the alleged attempted monopolization is, for purposes of this case, assumed to be that of rail transportation to and from northern New England. The principal customers are thirty plants producing building materials, wood pulp, and paper located in Maine, New Hampshire, and Vermont, and their suppliers and customers. Incoming traffic consists of clay, chlorine, and other supplies; outgoing traffic consists of paper, pulp, and building materials. Of the thirty plants, twenty-three are on Guilford's lines; three are on a line of the Bangor

and Aroostook Railroad in Maine; one is on the short-line Aroostook Valley Railroad in northern Maine; and three are on the St. Lawrence & Atlantic Railroad in Vermont. CP and Guilford compete for plants on the Bangor and Aroostook line; neither serves mills on the St. Lawrence & Atlantic Railroad. There are no plants on a CP line.

### The Issue

The basic theme of the complaint, filed on August 1, 1994, is that CP, a corporation with some $10 billion in revenues, attempted to drive out of business or force the sale of Guilford, which was in fragile financial circumstances, thereby destroying competition in the market above described. In submitting its motion for summary judgment, CP assumed the truth of facts alleged in the complaint. Therefore, the relevant market, the intent to monopolize, and the existence of predatory conduct—three of the four requisites of an attempt to monopolize—are not in issue. What is to be decided is whether the complaint and affidavits raise a genuine issue of fact as to the existence of "a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993).

### The Facts Alleged

We take the facts as alleged in the complaint. Although we review a summary judgment decision in which the district court considered both the complaint and an affidavit from each party, the affidavits submitted do not assert any facts that are relevant to our decision.

After covering the material we already have briefly described, the complaint addresses CP's underlying motive. It alleges: (1) on May 15, 1990, CP agreed to purchase the Delaware and Hudson Railway Company (D & H); (2) before this purchase, Guilford linked much of its traffic to and from points outside New England through D & H lines, amounting to 68 percent of Guilford's traffic in 1988, and dropping to 43 percent in 1989; (3) in 1990, at some unidentified time, the figure dropped to 27 percent; (4) CP's purchase of D & H was "predicated upon D &

H/CP retaining the share of interchange traffic D & H had historically had with [Guilford];" (5) D & H/CP has sustained subsequent yearly losses of some $8 million; and (6) therefore, since retaining the Guilford interchange business was essential to D & H's health, CP "entered into a series of transactions" to weaken Guilford, force a lease, sale, or bankruptcy, "from which CP and others would be able to acquire its lines."

Four activities were alleged under the caption of "Defendant's Unlawful Conduct." The first was a 1989 request to obtain trackage rights over Conrail lines in Pennsylvania and Maryland as a prerequisite to the acquisition of D & H lines. Conrail refused.

In early 1990, an effort was made, in connection with CP's planned acquisition of D & H, to increase the level of traffic interchange between Guilford and D & H through a proposal to acquire trackage rights, with an option to purchase, over Guilford's line between Mechanicville, New York, and Fitchburg, Massachusetts. Guilford rejected the proposal.

At the same time, in April and May, 1990, CP sought the assistance of the Federal Railroad Administration (FRA) in obtaining the consent of Guilford to CP's proposal. FRA allegedly cooperated by threatening to default Guilford's subsidiary, Boston and Maine, under a preference share agreement with FRA, which would trigger a B & M obligation to pay FRA some $26 million. FRA senior management also allegedly stated that Guilford would regret it if the company turned down CP's proposal. In late 1990, FRA notified B & M that its "reconfiguration" of part of a line (i.e., removal of tracks) violated the preference share agreement. Had FRA called a default, CP knew that Guilford would face bankruptcy and be subject to acquisition by CP on favorable terms. But no default is alleged to have been declared.

These three instances of alleged efforts, while evidence of intent, produced no results adverse to Guilford. Only the fourth alleged incident describes an effort ripening into conduct. Both CP and Guilford submitted bids to a large paper-making facility, the Great

Northern plants, for transport of 4,744 carloads of paper to 165 locations between January 1, 1991 and April 30, 1993. CP's bids were for less than its estimated average variable cost; for example, the average variable cost for one bid involving more than a fourth of the total traffic was estimated at $1,000 per carload while the expected revenue was less than $350. In December 1990, CP was awarded a contract for 4,204 carloads.

The complaint alleged that this conduct was "intended to divert revenues from the Guilford Rail System" so as to weaken it and permit CP "or others collaborating with CP" to acquire it. The essential part of the complaint concluded with the allegation that CP, once it had acquired Guilford, could recoup the costs of such predatory pricing through restoring the interchange traffic and increasing rail rates. The high barriers to new entry in the market and the weakened condition of Guilford allegedly contributed to the likelihood that CP would accomplish this goal.

### Proceedings Below

CP's motion for summary judgment urged three grounds. First, accepting the truth of all allegations, CP claimed exemption from antitrust liability under 49 U.S.C. § 11321(a), which provides that ICC approval of a purchase of one carrier by another creates an exemption "from the antitrust laws and from all other law ... as necessary to let that person carry out the transaction, hold, maintain, and operate property...." Second, CP claimed that there existed no dangerous probability of monopoly in any event because it was not alleged that CP had any market power, and it had not been shown probable that Guilford would agree to sell to CP or that the ICC would approve such a purchase. Third, CP argued that the state law claims, resting on the district court's supplemental jurisdiction, should be dismissed along with the federal claim.

The district court, after an unfortunate two year hiatus during which apparently no progress was made in resolving the case, rested its summary judgment on the following conclusions: deeming market share a "highly significant" though not exclusive factor in assessing the probability of successful monopolization, it reasoned that at most CP controlled little more than ten percent of the market, which was not "sufficiently 'proximate' to monopoly;" that nothing in the record indicated that, if Guilford were forced to sell its rail lines, it would sell to CP; and that the record failed to demonstrate that ICC approval would be forthcoming. Finding the federal antitrust claim unsupported by sufficient factual allegations to create a genuine issue, the court in its discretion declined to exercise its supplemental jurisdiction over the state claims.

### Discussion

*Standards.* The familiar standards of summary judgment review apply here. Some are in appellants' favor: review is plenary, *Steinke v. SunGard Financial Systems*, 121 F.3d 763, 768 (1st Cir.1997); a genuine issue of fact that is truly material will defeat the motion, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325–27, 106 S.Ct. 2548, 2553–55, 91 L.Ed.2d 265 (1986); and facts and reasonable inferences therefrom must be taken favorably to the non-movant, *Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 490 (1st Cir.1992).

But other standards have come to hold in check too ready a creation of a factual issue. Unsupported assessments, conclusory allegations, and speculative suppositions carry no weight. *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). We add to this litany that in a case such as this, where intent and subjective motive are not in question, but where the issue involves the objective and rather technical data called for by the requirement of a dangerous probability of achieving monopoly power, the careful construction of a complaint takes on enhanced importance.

■ In addition to standards of review, standards of careful practice caution that the pleader anticipate a summary judgment motion and have in mind the availability of Fed.R.Civ.P. 56(f) if further discovery seems necessary, that timely steps to amend be taken when the need arises, and that appropriate proffers of evidence be made if the

record needs supplementing. Moreover, a motion for summary judgment thrusts into possible question any fatal factual deficiency, whether or not it is then at the forefront of controversy. A non-movant must live with the double standard that, while a loser at the fact finding stage cannot raise new issues to secure reversal, "A party may defend a judgment in its favor on any legitimate ground without appealing from the judgment on that issue." *United States v. Massachusetts Institute of Technology*, 129 F.3d 681, 686 (1st Cir.1997) (citation omitted).

*ICC Approval Immunity.* By far the major emphasis below on the part of CP was placed on the argument that, since the entire objective of CP's scheme was, according to the complaint, the acquisition of Guilford, and since such an acquisition of one railroad by another must be approved by the ICC (now by the Surface Transportation Board), CP would fit the statutory description of "[a] rail carrier ... participating in ... a transaction approved by the [ICC]" who may "own and operate property ... acquired through the transaction ... exempt from the antitrust laws...." 49 U.S.C. § 11321(a).

Before the district court, CP conceded for the purpose of this argument that it would acquire Guilford, but, based on the above reasoning, contended that it would be exempt from antitrust liability. On appeal, Guilford strenuously argues that any exemption must be restricted to a transaction that is "necessary to let that rail carrier ... hold, maintain, and operate property ... acquired through the transaction." *Id.* CP's predatory pricing, it maintains, was prior to and separate from acquisition of Guilford by CP. There would be no policy reason to exempt such preliminary conduct; a company that mercilessly took all kinds of actions to bring a victim to its knees should not be granted absolution if its malevolent campaign proved successful. Moreover, antitrust exemptions should be narrowly construed.

We are not impressed with the cases cited by CP. Its simple rationale is that if acquisition of Guilford (and the consequent monopoly position of CP in the market) is approved and therefore immunized by the ICC, an attempt to achieve such a legal status cannot be unlawful. But although government approval of a consolidation or merger may exempt those who took part from legal obstacles that would hinder its consummation, as in *Brotherhood of Locomotive Engineers v. Boston & Maine Corp.*, 788 F.2d 794, 800–801 (1st Cir.1986), CP has given us no authority for extending immunity to remote and egregious conduct that brings about a condition of subservient vulnerability and thus sets the stage for a subsequent consolidation, merger, or purchase agreement.

While we acknowledge a considerable scope of immunity created by ICC approval, we are unwilling to take a position of first impression and grant immunity as a per se matter to all events that precede the ICC action. We find distasteful the proposition that a railroad company could indulge in any kind of anticompetitive chicanery and, if successful, be immunized, or, if not successful, defend against an unlawful attempt charge because there would be no dangerous probability of monopoly. Like the district court, we shall not pass on this issue.

■ *Market Power.* As we have observed, the district court placed some reliance on its estimate that CP controlled not much more than ten percent of the market. Guilford maintains that since the complaint alleged that there were only two market participants, Guilford and CP, and that CP intended to force the sale of Guilford's assets to CP, and since CP had the financial means to accomplish this, a jury could find that a dangerous probability of monopolization existed. Pre-predation market power under these circumstances, argues Guilford, is not the sole indicator of success.

We are well aware of the impressive case law requiring a plaintiff in an attempted monopolization case to demonstrate a substantial pre-existing market share. We affirmed the decision in *Benjamin v. Aroostook Med. Ctr.*, 937 F.Supp. 957, 966–67 (D.Me.1996), *aff'd*, 113 F.3d 1 (1st Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 602, 139 L.Ed.2d 490 (1997), which recognized that the requirement of market power is commonly shown by market share. But most of the cases cited by CP are pre-*Spectrum Sports*. And that decision does not impose an inflexi-

ble requirement that pre-predation market share be demonstrated. As the district court recognized, *Spectrum Sports,* after recognizing the higher standard of proof required against a single firm, as contrasted with concerted activity, states that

> demonstrating the dangerous probability of monopolization in an attempt case also requires inquiry into the relevant product and geographic market *and the defendant's economic power in that market.*

*Spectrum Sports,* 506 U.S. at 459, 113 S.Ct. at 892 (emphasis added).

Areeda and Hovenkamp, in their antitrust treatise, *see* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 807, p. 355 (1996), engage in a thoughtful discussion of the requirement of market share, tending to resist expansionary doctrine, but acknowledging merit in some relaxation of the requirement. Their bottom line is: "The all-important consideration is that the alleged conduct must be reasonably capable of creating a monopoly in the defined market." *Id.* They add, "As always, however, market share is an imperfect surrogate for market power." *Id.* They make the interesting comment that the threshold power requirement might be lowered if only injunctive "cease-and-desist" relief were requested, rather than triple damages and attorney's fees. *Id.* at 357.

Guilford relies on *United States v. American Airlines,* 743 F.2d 1114, 1118–19 (5th Cir.1984), as precedent for assessing the probability of monopolization by adding the market share of Guilford, the putative victim, to that of CP. The company also properly cites Areeda & Hovenkamp's *Antitrust Law* ¶ 807h, p. 362, as recognizing this addition as appropriate "in some circumstances." But it is quite clear that in *American Airlines,* the offer of American to its fierce competitor, Braniff, to end their competition and jack prices twenty percent was "uniquely unequivocal and its potential ... uniquely consequential," 743 F.2d at 1119. In other words, the conduct was "the most proximate to the commission of the completed offense that [it] was capable of committing." *Id.* at 1118–19. In the instant case, predatory pricing would have to persist so far as to bring Guilford to the point of selling or bankruptcy, a sale to CP would have to take place, and approval would have to be granted by the ICC before monopolization became a fact.

We recognize that aggregation of the market power of predator and predatee may in some cases be warranted, and we do not insist on proof of thirty or fifty percent or some such percentage of market share as a per se threshold requirement in all attempted monopolization cases. But we give weight to the traditional requirement, and require exceptional circumstances before straying from it. An all-powerful outsider with unlimited financing and a record of persistent, unambiguously anticompetitive conduct that has a demonstrably serious adverse effect on its competitor might well pass the test.

As we discuss below, however, this is not such a case.

*Other Factors Relevant to Dangerous Probability.* Notwithstanding the lack of asserted facts demonstrating market share, Guilford would have us conclude that CP's conduct reasonably could be thought capable of creating a dangerous probability of monopolization in the northern New England rail transportation market based on the fact that CP admitted the truth of the allegations of the complaint for purposes of summary judgment. Guilford asserts that the complaint alleged that Canadian Pacific would acquire Guilford's rail assets and that CP conceded this point.

It is clear to us, however, that CP's attempt to obtain a stipulation that monopolization necessarily assumed acquisition by CP was in the context of CP's contention that ICC approval of any acquisition conferred antitrust immunity. Indeed, a concession for all purposes that acquisition of Guilford was probable would also be a concession of the basic point at issue, the existence of a dangerous probability of monopoly.

■ No more persuasive is Guilford's assertion of prejudicial error in the court's refusal to consider a proffer of evidence that CP would purchase Guilford's assets. The "evidence" was a statement by Guilford's counsel at a motion hearing that he had obtained a document showing CP's belief that it would acquire Guilford's assets when Guil-

ford succumbed to bankruptcy, which it thought was imminent. Not only was there no subsequent attempt through affidavit or otherwise to have the document admitted to the record, but even more importantly, the substance of the representation was only that CP did indeed aspire to acquire Guilford's assets and believed in its feasibility, something that has not been in issue. A belief of an aspirant does not constitute evidence of the probability of realization of the aspiration. We see no merit in this assertion of error, either procedurally or substantively.

This brings us to an analysis of the conduct alleged. To begin, we must dismiss the several allegations of conduct that resulted in no action—the 1989 refusal of Conrail to grant trackage rights, the 1990 rejection by Guilford of CP's request for trackage rights between Mechanicville and Fitchburg with an option to purchase, and the 1990 failure of the Federal Railroad Administration to follow through on its CP-induced threats of default.

We are left with the single instance of CP's below cost bid to Great Northern and the resulting contract in December 1990. Guilford would have us attach no relevance to the solitariness of the predatory pricing incident, on the ground that CP has conceded the alleged existence of such conduct. But mere existence of predatory price cutting, and the extent of such conduct sufficient to justify a finding of dangerous probability of monopolization, are two quite different issues.

■ Guilford also contends that CP, which opposed Guilford's "Motion to Allow Discovery to Proceed"—a motion "designed to obtain information that would permit the identification of particular instances where Canadian Pacific engaged in below cost pricing"—should not now be permitted to argue for affirmance because of the inadequacy of the complaint. But the Motion to Allow tells us only that the documents withheld by CP as "highly confidential" "involve revenue and cost data [which] go to the heart of [Guilford's] predatory pricing claim." There is no assertion that Guilford intended to broaden the complaint to add other incidents to the bids on the Great Northern business.

We are not in a position to judge whether Guilford was unfairly cut off from obtaining evidence necessary to withstand a motion for summary judgment. There exists a clear-cut way for a litigant in Guilford's position to avoid this difficulty of exercising hindsight. Rule 56(f) of the Federal Rules of Civil Procedure specifically calls upon a litigant who feels prejudiced by too precipitate a demand for summary judgment to file a timely affidavit with the court asserting the need for further discovery. As we have held, failure to resort to such first aid will ordinarily bar belated aid. *See Rivera–Flores v. Bristol–Myers Squibb Caribbean,* 112 F.3d 9, 14 (1st Cir.1997).

■ We are not moved by Guilford's explanation that it did not make a Rule 56(f) submission "because the Court had expressed its complete disinterest in evidence directed to that issue." CP's motion for summary judgment excluded no issue; its basis was "that there exists no genuine issue of material fact warranting a trial." At the hearing on the motion, the court indicated that it understood CP to be making an "alternative argument" to ICC immunity. A party opposing summary judgment must touch all bases. Even if the focus of counsel and the trial court is on one issue, an appellate court may affirm a judgment on another ground, if made "manifest by the record." *Frillz, Inc. v. Lader,* 104 F.3d 515, 516 (1st Cir.1997).

■ Even less worthy of consideration is Guilford's tortured argument that, despite its having made no move to amend its complaint, the court should have treated the summary judgment motion as a motion to dismiss and sua sponte given it the opportunity to do so. Although Guilford asserts that it "could plead additional facts that would cure any perceived insufficiency in the Complaint," such facts are not identified.

All that the complaint asserts is the single incident in which CP, through predatory pricing, obtained a contract to carry 4,204 carloads annually of Great Northern's 4,744 carload total. The contract was to expire on April 30, 1993. We do not know who obtained the contract to carry the remaining 540 carloads or why some other carrier man-

aged to withstand CP's predatory pricing. Although Great Northern's facilities were among the largest, there were 29 other plants in the market, only three of them served by CP. There is no information about the financial impact of this incident on Guilford. And there is no information concerning CP's market share.

Perhaps even more significantly, there is no evidence that CP engaged in predatory pricing after December 1990, some three years and seven months before Guilford's complaint was filed. There is no information relating to any new request for bids following expiration of the Great Northern contract on April 30, 1993. We are not told whether CP sought or retained that business.

We deem highly relevant and persuasive the following observations by Areeda and Hovenkamp in their treatise:

[W]hen challenged exclusionary conduct had ended three years earlier without increasing the defendant's market share or forcing the exit of any competitor, a court is likely to see no dangerous probability of success. Although the conduct's potential at the time it occurs, rather than its actual effect, determines its legality, later effects sometimes indicate the nature of that potential. . . .

We would find attempt claims presumptively implausible if the challenged conduct has been in place for at least two years and the remaining market remains robustly competitive as evidenced by ongoing entry, profitability of rivals, and stability of their aggregate market share.

*Federal Antitrust Law* ¶ 807f, pp. 360–61 (citing *Ashkanazy v. I. Rokeach & Sons, Inc.,* 757 F.Supp. 1527 (N.D.Ill.1991)).

Although this rationale apparently was not considered by the district court, it nevertheless was "made manifest by the record," *see Frillz,* 104 F.3d at 516, and constitutes an "independently sufficient ground" for decision, *see Hidalgo v. Overseas Condado Ins. Agencies, Inc.,* 120 F.3d 328, 332 (1st Cir. 1997) (citation omitted).

Another factor militating against a reasonable finding of dangerous probability of monopolization that the district court relied upon was the uncertainty of obtaining the necessary approval by the ICC. The court concluded its reasoning on this point by saying that "there is no way to judge how the ICC would view an acquisition of the Guilford Rail System by CP. Disapproval is just as likely as approval." We agree.

The relevant statute governing ICC approval is 49 U.S.C. § 11324(d), which requires approval of an acquisition unless "there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation . . . and . . . the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs." CP cites various instances where the ICC has disapproved mergers that threatened a reduction in competition; Guilford cites actions where "public interest" has been held to outweigh any reduction in competition. We simply do not know how the ICC would view the competing considerations on the record of this case.

So viewing the allegations of the complaint, we conclude that Guilford has failed to put forth sufficient facts to justify a finding of a dangerous probability of monopolization. We therefore have no occasion to consider the sufficiency of facts alleged to support the likelihood that CP would acquire Guilford's assets or CP's arguments concerning the absence of barriers to entry into the market and elasticity of demand.

We add that we see no reason to question the district court's action in declining to exercise its supplemental jurisdiction over state law claims.

*Affirmed. Each party to bear its own costs.*