**MURDOCK WEBBING COMPANY, INC., Plaintiff,**

v.

**DALLOZ SAFETY, INC., Defendant.**

No. C.A. 00–283L.

United States District Court,
D. Rhode Island.

July 31, 2002.

Elliot A. Salter, Jodi–Ann McLane, Salter & Michaelson, Providence, RI, Richard T. Redano, Duane, Morris, LLP, Houston, TX, for Plaintiff.

Joseph V. Cavanagh, Jr., Kristin Rodgers Sullivan, Blish & Cavanagh, Providence, RI, Thomas F. Holt, Jr., Kirkpatrick & Lockhart, LLP, Boston, MA, James R. Kyper, Donald R. Palladino, Kirkpatrick and Lockhart, LLP, Pittsburgh, PA, for Defendant.

### OPINION AND ORDER

LAGUEUX, Senior District Judge.

This matter is before the Court on cross motions for summary judgment. Defendant Dalloz Safety, Inc. ("Dalloz") claims complete ownership of patent number 6,006,700 ("700 patent). Plaintiff Murdock Webbing Company, ("Murdock") claims that its employee should be named as a joint inventor on the '700 patent. Additionally, Dalloz has moved to assert the affirmative defenses of waiver and equitable estoppel, unclean hands, and laches.

This federal question case deals with U.S. Patent 6,006,700 for a fall protection harness manufactured by Dalloz, incorporating elastic webbing manufactured by Murdock. Murdock is seeking a change of inventorship on the patent.

Because there are no genuine issues of material fact, this Court grants, as a matter of law, Dalloz's motion for summary judgment and correspondingly denies Murdock's motion for summary judgment.

## I. STATEMENT OF FACTS

Dalloz is engaged in the production of various safety equipment including fall protection harnesses. Dalloz acquired Miller Equipment Company ("Miller"). Miller was the original company engaged in the design and production of the elastic fall protection harness at issue in this case. At some point prior to 1995, Miller employee Richard Cox ("Cox"), then general manager of Miller, conceived of an idea for the fall protection safety harness embodied in the '700 patent. This harness incorporated elastic webbing with limited stretch in order to increase user comfort but still provide the necessary protection from falls. At the time of conception of the '700 patent, Cox, and his associates at Miller, were unaware of any webbing product which demonstrated the necessary qualities for use in the harness. Because no suitable webbing was known, the development of the project was delayed.

On May 9, 1995, Cox met with an employee of Murdock by the name of Robert E. Golz ("Golz"). Since 1973, Golz has been engaged in the design and manufacture of narrow fabrics, such as nylon webbing. Prior to 1995, Golz had produced nylon webbing with a certain degree of elasticity, including Murdock's webbing product number 2389 which was produced as early as 1982.

During their meeting of May 9, 1995, Cox requested that Murdock supply Miller with samples of elastic nylon webbing in order to determine their suitability for use in an elastic fall protection harness. There is a dispute as to the exact language of this request, and who proposed exactly what percentage of stretch be incorporated into the webbing. This dispute, however, is immaterial. Eventually, on March 13, 1995, Murdock supplied Miller with a sample of elastic webbing for Miller's evaluation. Following this exchange there were further discussions between representatives of Miller and Murdock regarding the necessary stretch level of the webbing. On March 23, 1995, Golz sent a second sample to Miller with a ten percent stretch. This was ultimately the webbing used in the construction of the safety harness claimed in the '700 patent.

Subsequently, Miller submitted its patent application on September 24, 1996. On June 6, 2000, Murdock commenced this action alleging that Golz was a joint inventor of the harness because of his input as to the percentage of stretch on various portions of the nylon webbing making up the harness, as well as his contribution on the design of the webbing itself. The parties filed cross motions for summary judgment and Dalloz filed motions requesting that it be allowed to assert the affirmative defenses of waiver and estoppel, unclean hands, and laches.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides the standard for the review of a motion for summary judgment. "The Judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This Court may grant a motion for summary judgment if no genuine issues of material fact exists. Any fact that could affect the outcome of the suit is material. *Ryan, Klimek, Ryan Partnership v. Royal Ins. Co. of Am.*, 728

F.Supp. 862, 866 (D.R.I.1990), *aff'd,* 916 F.2d 731 (1st Cir.1990). Further, this Court must view all evidence and related inferences in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.,* 133 F.3d 103, 106 (1st Cir.1997). "When the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir.1995). Similarly, "summary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.,* 777 F.Supp. 167, 169 (D.R.I.1991). Summary judgment is only available when there is no dispute as to any material fact and only questions of law remain. *See Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir.1996). Additionally, the moving party bears the burden of showing that no evidence supports the nonmoving party's position. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The coincidence that both parties move simultaneously for summary judgment does not relax the standards under Rule 56. *See Blackie,* 75 F.3d at 721. Barring special circumstances, the District Court must consider each motion separately, drawing inferences against each movant in turn. *See Id.*

## III. DISCUSSION OF LAW

 All applications for patents are required to be submitted with the name of the inventor. 35 U.S.C. § 111(a)(1). When a co-inventor is not named in a patent application, and the patent has been issued, a co-inventor may file to amend the patent to reflect the true inventorship of it. Such an amendment is filed under 35 U.S.C. § 256, which states:

Whenever through error a person named in an issued patent as the inventor or through error an inventor is not named on an issued patent and such an error arose without any deceptive intention on his part, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate.

35 U.S.C. § 256. If a party desires a change in inventorship, that party may apply to the Court to direct that the change be made. *See Stark v. Advanced Magnetics, Inc.,* 119 F.3d 1551, 1552–3 (Fed.Cir.1997); *MCV, Inc. v. King–Seeley Thermos Co.,* 870 F.2d 1568, 1570 (Fed. Cir.1989). If a party engages in intentional misjoinder or non-joinder of inventors, then the Court may declare the patent invalid. *See Stark,* 119 F.3d at 1553.

 In cases where the inventorship is disputed, an individual asserting joint inventorship before the courts must demonstrate, by clear and convincing evidence, that he or she made some contribution to the development of the invention that rises to the level of inventorship. *Hess v. Adv. Cardiovascular Sys. Inc.,* 106 F.3d 976, 980 (Fed.Cir.1997). The listing of inventors on the patent application is presumed to be accurate. *Id.* This presumption is supported by important policy considerations, as there is a "strong temptation for persons who consulted with the inventor and provided him with materials and advice, to reconstruct, so as to further their own position, the extent of their contribution to the conception of the invention." *Id.*

 Joint invention is the "product of a collaboration between two or more persons working together to solve the problem addressed." *Burroughs Wellcome Co. v. Barr Lab., Inc.,* 40 F.3d 1223, 1227 (Fed.Cir.1994) (citing *Kimberly–Clark*

Corp. v. Proctor & Gamble Distrib. Co., 973 F.2d 911, 917 (Fed.Cir.1992)). Individuals can be considered joint inventors even if they did not physically work on the invention together or at the same time. 35 U.S.C. § 116. Additionally, one inventor may make a substantially greater or lesser contribution than the other named inventor. *Id.* There is no definition of the minimum quality or quantity of contribution required for joint inventorship. *Burroughs Wellcome,* 40 F.3d at 1227.

■■■ The generally accepted test for inventorship is that of "conception"—conception is said to be the "touchstone" of inventorship. *Burroughs Wellcome,* 40 F.3d 1223, 1227–8; *see also Sewall v. Walters,* 21 F.3d 411, 415 (Fed.Cir.1994). Conception is "the formulation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed. Cir.1986). Conception is complete only when "the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation". *Burroughs Wellcome,* 40 F.3d at 1228. Thus, the test for conception is "whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention." *Id.* For an idea to be considered definite and permanent the inventor must have a "specific, settled idea, a particular solution to a problem at hand, not just a general goal or research plan he hopes to pursue." *Id.*

■■■ It follows from this definition of conception that one who assists an inventor in reducing an invention, previously conceived, to practice, may not be considered an inventor. *See Ethicon, Inc. v. U.S. Surgical Corp.,* 135 F.3d 1456, 1460 (Fed.Cir.1998). There must be some form of inventive act. *See Id.* The exercise of the normal skill expected of one skilled in the art of a particular industry or technique utilized in the reduction of a conceived invention to practice does not make that person a joint inventor. *See Fina Oil and Chem. Co. v. Ewen,* 123 F.3d 1466, 1473 (Fed.Cir.1997). An inventor, does not lose his or her status as a joint inventor just because he or she used the services, ideas, and aid of others in the process of perfecting the invention. *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 624 (Fed.Cir. 1985); *see also Hobbs v. U.S. Atomic Energy Comm'n,* 451 F.2d 849, 864 (5th Cir. 1971). An individual may not be considered a joint inventor if his or her only contribution to a patented invention is explaining to the actual inventors well known concepts or the current state of the art in a particular industry. *Fina* 123 F.3d at 1473. Activity such as describing how particular products could be used to meet the needs of an invention does not rise to the level of inventorship. *Hess,* 106 F.3d at 981.

Such a rule serves the underlying policy of rewarding and promoting individual thought. *See O'Reilly v. Morse,* 56 U.S. 62, 111, 15 How. 62, 14 L.Ed. 601 (1853). Without such a rule there would be a disincentive for people to seek new ways of utilizing existing materials or concepts in the inventive process because they would be beholden to those who assisted them. *See Id.* This issue was addressed by the United States Supreme Court as far back as 140 years ago, when it ruled on Samuel Morse's discussions with scientists relating to his wireless set. The Court noted that, "no invention can possibly be made ... without a thorough knowledge of the properties of each [different element] ... and it can make no difference, in this respect, whether [the inventor] derives his information from books, or from conversations

with men skilled in the science." *Id.* at 111, 15 How. 62.

■ If an inventor seeks the input or advice of another in reducing an invention to practice such input or advice does not automatically rise to the level of joint inventorship. *Ethicon*, 135 F.3d at 1460. In *Ethicon*, the Federal Circuit stated that, "depending on the scope of the patent's claims, one of ordinary skill in the art who simply reduced the inventor's idea to practice is not necessarily a joint inventor, even if the specification discloses that embodiment to satisfy the best mode requirement." 135 F.3d at 1460. *Ethicon* holds that an inventor may seek such advice or assistance when reducing his or her invention to practice and not be subjected to losing full ownership of the invention. *Id.* An individual can contribute to the final embodiment of an inventor's invention. The analysis turns on whether that contribution contains the necessary element of "conception" and thereby rises beyond the simple reduction to practice of the inventor's previously conceived idea. *Id.; Burroughs Wellcome* 40 F.3d at 1227–8.

## IV. DISCUSSION OF LAW APPLIED TO FACTS

■ Murdock alleges that its representative, Golz, should be named as a joint inventor on the '700 patent. Murdock alleges that his contributions to the claims in the '700 patent amount to inventorship. Murdock asks this Court to name Golz as a joint inventor. The holdings of the Federal Circuit in this area, however, make it apparent that Golz's claim of joint inventorship is baseless. *See Ethicon*, 135 F.3d at 1460; *Fina*, 123 F.3d at 1472–3; *Hess* 106 F.3d at 981; *Sewall*, 21 F.3d at 416. Golz's contributions to the '700 patent did not rise beyond the level of simply reducing the claimed invention to practice, nor did they contain the necessary element of conception.

Murdock alleges that Golz was a joint inventor of the '700 patent, conceiving of 12 elements or limitations claimed in the patent and contributing to the development of the elastic webbing as a whole. These 12 claims or limitations deal with the elastic webbing, an integral part of the harness as it was conceived by Cox. Specifically, Murdock alleges that the percentages of stretch of certain portions of the harness as well as the makeup of the elastic webbing as a whole were conceived by Golz. Murdock argues that therefore Golz should be named an inventor on the '700 patent. In its opposition to Dalloz's motion for summary judgment, Murdock alleges that there are questions of material fact as to whether Golz was a joint inventor of the '700 patent. This is not the case.

Ultimately Murdock's sole claim is that Golz contributed to the establishment of the percentage of stretch of the webbing that was to be used in various areas of the harness. The percentage of stretch of a given section of webbing amounts to a reduction to practice of a previously conceived invention. Cox conceived of a fall prevention safety harness as manager of Miller before 1995. His conception, as claimed in the patent, was for a safety harness that incorporated elastic webbing which would stretch to a certain degree and then stop, still retaining the breaking strength of webbing used in traditional harnesses. U.S. Patent No. 6,006,700 (issued Dec. 28, 1999). This was the point of conception for the harness claimed in the '700 patent. At that time the invention was "definite and permanent" and all that remained to be done was to reduce the invention to practice. *See Burroughs Wellcome* 40 F.3d at 1228. That the complete invention was conceived at this time makes Cox the sole inventor of the '700 patent. *See Id.* The ultimate determination of the percentage of stretch for the

webbing incorporated into the harness amounted to a reduction to practice of the claimed invention. In reducing his invention to practice, Cox consulted with an individual skilled in the relevant art who went on to explain the state of the art in nylon webbing to him. Such a consultation is precisely what has come to be viewed as a reduction to practice. *See Fina* 123 F.3d at 1473; *Hess* 106 F.3d at 980–1; *Sewall* 21 F.3d at 416.

In fact, Murdock's allegations of Golz's involvement with the '700 patent do not appear to be any more than those of a "skilled salesman," who is attempting to show a perspective buyer what his product can do for him and how it may be best utilized. *See Hess,* 106 F.3d at 981. Golz did no more than explain what the webbing produced by Murdock could do, including what sort of elastic stretch could be achieved. Since Cox was not an expert on the construction of webbing he sought the advice of a manufacturer. During the course of those discussions a percentage of stretch for the webbing was reached which was compatible with what was commercially available. Golz was integral in explaining what was available by way of nylon webbing, but this does not make him an inventor. *See Id.* Even assuming that Golz originally suggested the percentage of stretch finally used in the '700 patent, he did so as one knowledgeable in the state of the art, explaining such options to an inventor seeking his advice in reducing an invention to practice. Viewing the facts in the light most favorable to Murdock, there is no genuine dispute as to material facts. Because there are no material facts in dispute, this Court concludes, as a matter of law, that Cox was the sole inventor of the '700 patent. The allegation that Golz suggested the percentage of stretch demonstrates nothing more than that his involvement was nothing more than a reduction to practice of the '700 patent.

The case of *Hess v. Advanced Cardiovascular Sys., Inc.* is strikingly similar to the case at bar. 106 F.3d 976 (Fed.Cir. 1997). In *Hess* plaintiff alleged that he was a joint inventor of a balloon angioplasty catheter that was used to enlarge potentially fatal blockages in the arteries leading to the heart. *Id.* at 977 Hess was an engineer who was employed by a company which manufactured a materiel that was suitable for making the balloons used in the angioplasty procedure. *Id.* In attempting to show how the materiel could be used to construct the balloon Hess suggested numerous techniques and demonstrated the use of the materiel. *Id.* at 977–78. After the inventors applied for, and received, a patent for their new angioplasty device, Hess sued, alleging joint inventorship. The Federal Circuit stated that Hess did nothing more that what any good salesman would do in hawking his product. *Id.* at 980–81. The Circuit further held that Hess did not provide any information to the inventors beyond that which was part of the state of the art in his particular field. *Id.* Finally the Circuit held that in light of Hess' contributions he could not properly be named a joint inventor. *Id.* at 981.

In support of its motion for summary judgment, Murdock contends that the development of the safety harness was delayed a number of years because of a lack of suitably elastic nylon webbing. Additionally, Murdock argues that Golz undertook an extensive development program for the nylon webbing that was ultimately used. Murdock thus posits that this demonstrates Golz's contribution as a joint inventor of the '700 patent. On the contrary, a delay between conception and completion clearly demonstrates that the idea for the harness was "definite and permanent" in the mind of Cox and all that remained was a reduction to practice. *See Burroughs Wellcome,* 40 F.3d at 1228.

Such permanence is a requirement of an inventive act. *Id.* Additionally, "each inventor must contribute to the joint arrival at a definite and permanent idea of the invention as it will be used in practice". *Fina,* 123 F.3d at 1473 (Quoting *Burroughs Wellcome,* 40 F.3d at 1229). The conception of the '700 patent as a whole had already been achieved and all that remained was its reduction to practice. Conception is the touchstone of inventorship, and is said to be complete only when, "the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Burroughs Wellcome,* 40 F.3d at 1228. The development program, which Murdock alleges Golz undertook, was nothing more than what any individual, skilled in the manufacture of nylon webbing, would do to alter his product to suit the needs of his customers. *See Hess* 106 F.3d at 981. Therefore, Golz's so called development program is of no consequence in determining the inventorship of the '700 patent issue in this case.

Murdock further claims that Cox included descriptions and drawings of "double plain weaves" furnished to him by Golz in the patent application for the '700 patent. Again, these claims do not support Murdock's allegations. 35 U.S.C. § 112 requires that all patent applications include,

a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112. The patent application must of necessity contain specifications relating to the construction of the elastic webbing. That Cox may have derived these diagrams and descriptions from discussions with Golz is of no consequence. The patent application process demands that they be included in the application. That does not throw into question the inventorship of the '700 patent. *See Ethicon* 135 F.3d at 1460; *Sewall* 21 F.3d at 416.

Finally, Murdock argues that Golz's claim of joint inventorship of the '700 patent is supported by the fact that joint inventors need not work on the same subject matter nor make the same quality or quantity of contributions to the subject matter claimed in the patent. 35 U.S.C. § 116; *Burroughs Wellcome,* 40 F.3d at 1227. To constitute joint inventorship, both individuals' work must rise to the level of inventorship and each inventor's contribution must contain the necessary element of conception. *See Ethicon,* 135 F.3d at 1460. Because Golz's contributions were by one skilled in the state of the art, assisting in reducing the '700 patent to practice, his contributions do not rise to the level of inventorship. *See Sewall,* 21 F.3d at 416-7. As noted above, conception is the "touchstone of inventorship." *Burroughs Wellcome,* 40 F.3d at 1227. Golz did not conceive of the percentage of stretch, or other properties of the nylon webbing used in various sections of the harness claimed in the '700 patent. At best he made suggestions on that matter as one knowledgeable in the limitations of the manufacture of elastic nylon webbing. Such suggestions lacked the critical element of conception. Golz had no input into the conception of the invention as a whole, or even where his elastic webbing fit into it. *See Fina,* 123 F.3d at 1473; *Burroughs Wellcome,* 40 F.3d at 1227-8. Such a "definite and permanent" knowledge of the invention as a whole is required for inventorship. *See Fina* 123 F.3d at 1473.

This Court concludes that the facts that plaintiff assert in support of its claims are not material. When viewed in a light most favorable to Murdock the facts demonstrate that, as a matter of law, Golz lacked the necessary inventive contribution to be named joint inventor of the patent. See *Ethicon*, 135 F.3d at 1460; *Hess*, 106 F.3d at 981. Additionally the undisputed facts illustrate only that Golz contributed to reducing the '700 patent to practice and nothing more. *Hess*, 106 F.3d at 981.

### V. Conclusion

For the foregoing reasons, defendant Dalloz's motion for summary judgment is granted. Plaintiff Murdock's motion for summary judgment is denied. Defendant Dalloz's motions to add affirmative defense claims are denied because of mootness.

The Clerk shall enter judgment for defendant forthwith.

It is so ordered.