STATE OF MAINE                         SUPERIOR COURT
PENOBSCOT, SS.                       CIVIL ACTION
                                  Docket No. CV-05-25

FILED & ENTERED
SUPERIOR COURT

OCT 24 2005

PENOBSCOT COUNT'

The Environmental Exchange, Inc.,
    Plaintiff

    v.                           Order (Motion to Amend; Motion
                                to Dismiss; Discovery Dispute)

Casella Waste Systems, Inc. et al.,
    Defendants

       Pending before the court are the plaintiff's motion to amend its complaint and the defendants' motion to dismiss that complaint. The court has considered the parties' submissions regarding these motions.

       In its motion to amend, the plaintiff seeks leave to amend the first amended complaint in a way that would preserve one of the three existing counts, alleging conspiracy to monopolize (count 2 in the original pleadings and in the proposed second amended complaint), and that would add a new count, attempt to monopolize (count 1 in the proposed second amended complaint). The defendants object to the motion to amend, arguing that the counts in the prospective pleading do not allege a basis for relief and that an order allowing the amendment would be futile. Despite this contention, the court grants the motion to amend and examines the sufficiency of the allegations in light of the defendants' motion to dismiss the complaint, which, now, is the second amended complaint).

       "A motion to dismiss tests the legal sufficiency of the complaint." *McAfee v. Cole*, 637 A.2d 463, 465 (Me. 1994). On a motion to dismiss, the court takes the allegations to be true. *In re Wage Payment Litigation*, 2000 ME 162, ¶ 3, 752 A.2d 217, 220. From this starting point, the complaint then is examined "in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *McAfee*, 637

1

A.2d at 465. A dismissal is proper "only when it appears beyond doubt that a plaintiff is entitled to no relief under any set of facts that he might prove in support of his claim." *Hall v. Board of Environmental Protection*, 498 A.2d 260, 266 (Me. 1985). *See also Heber v. Lucerne-in Maine Village Co.*, 2000 ME 137, ¶ 7, 755 A.2d 1064, 1066. Even beyond this deferential standard of review, dismissal of complaints sounding in antitrust violations in particular should be granted "very sparingly" because proof of such misconduct is often in the hands of the offenders, justifying the complainant an opportunity to conduct discovery prior to dispositive action on the claim. *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 48 L.Ed.2d 338, 345 (1976).

For purposes of the motion at bar, the court takes as true the following allegations set out in the second amended complaint. Defendant New England Waste Services of ME, Inc. ("NEWS") is a subsidiary of Defendant Casella Waste Systems, Inc. ("Casella"). *See* second amended complaint at ¶ 5. Through Casella, NEWS operates under several names, including New England Organics ("NEO"). *See id.* at ¶ 7 and exhibit A to second amended complaint. Both the plaintiff and NEWS, through that part of the business named NEO, provide for the "agronomic utilization" of "residuals,"[1] which is a category of solid wastes that includes fly ash. *See id.* at ¶¶ 7, 12. Agronomic utilization requires technical knowledge that makes market entry difficult. *See id.* at ¶ 14. The plaintiff and NEWS are the sole major providers of agronomic utilization in eastern Maine, and there are only two other companies in Maine that provide this service. *See id.* at ¶¶ 22-23.

Residuals, including fly ash, are categorized as "special waste." *See* second amended complaint at ¶ 15. Special waste may be disposed only in landfills specifically permitted by the Maine Department of Environmental Protection to receive special waste. *Id.* The DEP has issued permits for only two commercial landfills in eastern Maine (Penobscot, Hancock, Washington, and Aroostook counties) to accept special waste. *See*

---

[1] "Agronomic utilization" refers to the land application of residuals in a controlled manner in order to supply crop nutrients, improve soil conditions, or provide some other horticultural benefit. "Residuals" are solid wastes generated from municipal, commercial, or industrial facilities that have undergone scrutiny by the Department of Environmental Protection to make sure they are suitable for agronomic utilization. *See* second amended complaint at ¶ 8.

*id.* at ¶ 16. Those landfills are the Pine Tree Landfill in Hampden and the West Old Town Landfill in Old Town. *Id.* Pine Tree Landfill is owned by Casella and operated by NEWS. *See id.* at ¶ 17. The West Old Town Landfill is owned by the State of Maine and operated by Casella through New England Waste Services of ME Landfill Operations, LLC, which is a subsidiary of NEWS. *Id.* The next closest commercial landfill licensed to accept special waste is located 59 miles from Bangor. *See id.* at ¶ 18. Since 1989, there has been a statutory moratorium on the licensing of additional commercial landfills in Maine. *See id.* at ¶ 19; 38 M.R.S.A. § 1310-V.

Two facilities owned by Indeck Maine Energy, LLC are the only sources of clean fly ash in northeastern Maine. *See* second amended complaint at ¶ 24. NEO provided agronomic utilization services for Indeck for several years prior to 2004. *See id.* at ¶ 25. In the fall of 2004, however, Indeck sought a new contractual partner and solicited the plaintiff to submit a bid for the collection and agronomic utilization of ash produced at its two wood-to-energy facilities. *See id.* at ¶¶ 26-27. In mid-October 2004, the plaintiff submitted an initial bid, quoting a price for the collection and land application of the ash at area farms. *See id.* at ¶ 28. This bid, however, did not account for the deterioration of ash that is stored over the winter. *See id.* at ¶ 29. Accordingly, Indeck asked the plaintiff to submit a revised bid under which the plaintiff would haul ash to the Pine Tree Landfill from December through March and then apply ash to the land from April through November. *Id.*

Consequently, on October 27, 2004, Shannon Giles, the plaintiff's corporate president, left a phone message for one Marty Drew at Pine Tree Landfill, requesting a quote for the tipping fees charged for bringing ash to that landfill. *See* second amended complaint at ¶ 30. The next day, James Ecker, vice president of NEO (one of defendant NEWS' trade names), returned Giles' call. *See id.* at ¶ 31. NEO and the plaintiff were competing for the Indeck contract. *See id.* at ¶ 32. During the call, Ecker elicited information about the source and nature of the ash sufficient to identify the source as Indeck. *See id.* ¶ 31. Ecker then quoted a tipping fee price of $28.00 per ton, which is comparatively high for landfilling clean fly ash in northeastern Maine. *See id.* at ¶¶ 31, 33. On November 1, 2004, the plaintiff presented Indeck with a revised bid based on the tipping fee quoted by NEO for landfilling four months of the year and a revised price for

3

land application on agricultural fields for the remaining eight months of the year. *See id.* at ¶ 34. The contract was to run for three years, with an option for a fourth year. *See id.* at ¶ 41. Later in November, Giles again attempted to reach Drew at Pine Tree Landfill to confirm the tipping fee he received earlier from NEO, its competitor for the Indeck bid. *See id.* at ¶ 36. And again, Ecker, not Drew, contacted Giles. *Id.* Ecker confirmed the quoted tipping fee of $28.00/ton. *Id.*

NEO submitted its own competing bid for the Indeck contract to landfill the ash twelve months a year at a price lower than that submitted by Exchange to landfill only four months per year and land apply eight months. *See* second amended complaint at ¶ 38. Because the cost to dispose of ash in a landfill is greater than the cost to apply it agronomically, *see id.* at ¶ 35, and because NEO's bid was based on a proposal to use a landfill only, the tipping fee offered by NEO to Indeck must have been significantly lower than the $28.00 per ton that NEO quoted to the plaintiff. *See id.* at ¶ 38. Further, the tipping fee that NEO offered to Indeck was less than Casella's cost for landfill. *See id.* at ¶ 39. If Indeck had accepted the plaintiff's proposal, the contract would have generated receipts of nearly $300,000 for the plaintiff. *See id.* at ¶ 41.

The plaintiff alleges that as a result of the defendants' actions, it was deprived of the opportunity to compete fairly in an open market to obtain the Indeck contract. Specifically, the plaintiff asserts two counts in its second amended complaint: (1) an attempt to monopolize in violation of 10 M.R.S.A. § 1102, and (2) conspiracy to monopolize in violation of 10 M.R.S.A. § 1102. Section 1102, the statutory predicate to both causes of action, makes it unlawful for any entity to "monopolize or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce of this State. . . ." Thus, section 1102 proscribes actual monopolization, attempted monopolization and a conspiracy to monopolize. The second and third of these prohibited forms of conduct underlie the plaintiff's claims here. Contending that neither of the plaintiff's claims states a basis for relief, the defendants move to dismiss both such counts.

**A. Count 1 (attempt to monopolize)**

4

Section 1102 is materially identical to section 2 of the federal Sherman Act, 15 U.S.C. § 2.[2] Thus, the court draws on federal interpretive authority in construing the Maine statute.

Attempted monopolization in violation of section 2 of the Sherman Act occurs when a firm comes dangerously close, but does not actually acquire, monopoly power. 1 Antitrust Laws and Trade Regulation ("Antitrust Laws") (MB) § 2.03[2] 2nd ed. 2002). In order to establish a violation of this proscription, a claimant must prove three elements: (1) that the respondent engaged in predatory or anticompetitive conduct; (2) that the respondent harbored a specific intent to monopolize a relevant market; and (3) that there resulted a dangerous probability that the attempt would create monopoly power. 2 Antitrust Laws § 26.01[1]. The allegations in the plaintiff's second amended complaint are sufficient to provide support for each of these elements.

The first of these three elements focuses on a defendant's conduct. "The gravamen of a Section 2 claim is the deliberate use of market power by a competitor to control or exclude competition." *Mercy-Peninsula Ambulance, Inc. v. San Mateo County*, 791 F.2d 755, 759 (9th Cir. 1986). An attempted monopolization claim can be supported by proof of various types of conduct, including refusing to deal, price fixing, and predatory pricing. 2 Antitrust Laws § 26.01[3]. A predatory price is one that is below some measure of cost, under which the actor foregoes short-term profits and then raises prices later to recoup losses. *See e.g., Brooke Group Ltd. V. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224-25 (1993). Further, in some circumstances, failure to provide access to an essential facility may amount to anticompetitive conduct. 2 Antitrust Laws § 26.01[3]. As the plaintiff has set the stage through its allegations, the

---

[2] The federal statute reads:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2.

5

defendants own or otherwise operate the only two area landfills where fly ash can be disposed. One of those defendants, NEWS, extracted information from the plaintiff about a possible source of fly ash and then undercut the plaintiff's efforts to enter into a contract to purchase that fly ash from the third party, Indeck. Based on further allegations, NEWS did so by inflating the charge it would impose on the plaintiff to accept that waste and then used a lower price – one that was below its cost -- as the basis for its own bid extended to Indeck.

In the context of the full set of allegations set out in the second amended complaint, these allegations would support a colorable claim of anticompetitive conduct. Such a claim is stronger against NEWS, because the plaintiff claims that that defendant is responsible for the allegedly inflated quote for disposal and the predatorily priced bid that Indeck received, than against Casella. However, Casella is a player in the same industry and is the parent company of NEWS. Under these circumstances, particularly when the allegations are viewed in the highly deferential manner associated with antitrust claims, they are sufficient to state a cause of action against Casella as well as against NEWS.

Next, the second element of a claim of attempted monopolization examines the actor's intent. This element of culpability requires proof of a "specific intent to control prices in, or exclude competition from, a relevant market." *Spectrum Sports, Inc., v. McQuillan*, 506 U.S. 447, 459, 122 L.Ed.2d 247, 259 (1993); 2 Antitrust Laws § 26.01[2]. When a claim for attempted monopolization rests on allegations of predatory pricing, proof of that conduct itself may be sufficient evidence from which to infer specific intent. *Id.* Here, predatory pricing is at least one of the forms of conduct underlying count 1. Thus, the allegations of predatory pricing are an adequate basis for the corresponding claim of specific intent.

Finally, attempted monopolization requires proof of a "realistic probability that the defendants could achieve monopoly power in that market." *Spectrum Sports*, 506 U.S. at 459, 122 L.Ed.2d at 259. Monopoly power is usually defined as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). (Actual monopoly power need not be proven, because the applicable antitrust laws are directed at illegal attempts to accomplish that result.) Of the several factors that can be used to determine whether there exists a dangerous probability

6

of success in achieving monopoly power, one is the "ease of entry or barriers to entry." *Springfield Terminal Railway v. Canadian Pacific Ltd.*, 133 F.3d 103, 108 (1ˢᵗ Cir. 1997); 1 Antitrust Laws § 2.03(1)(a). Here, the two defendants (namely, a parent company and its subsidiary) operate the only two landfills in the area that are licensed to accept fly ash. Consequently, because fly ash cannot be stored over the winter for later agronomic distribution, the defendants can make entry into the industry almost impossible. Further, because the defendants operate the two landfills, they control tipping prices for fly ash in eastern Maine. When this alleged control is combined with claims of predatory pricing and other pricing control, the plaintiff has made out a paper claim sufficient to support this element.

Also relevant to the probability of successful monopolization is the defendants' existing market share, which in fact is the primary gauge used by courts to determine this third element of proof. *Tops Market v. Quality Markets*, 142 F.3d 90, 100 (2ⁿᵈ Cir. 1998). Here, the defendants operate all of the eastern Maine landfills authorized to accept fly ash, and the statutory moratorium forecloses the plaintiff from breaking into that part of the industry. Because access to landfills is an essential aspect to a year-round disposal operation, the defendants must be seen to enjoy an immense advantage in this share of the market, in which the plaintiff is the only other area participant. This circumstance adds to the sufficiency of the plaintiff's claim of attempted monopolization.

**B. Count 2 (conspiracy to monopolize)**

The defendants' motion to dismiss the plaintiff's claim of conspiracy to monopolize raises, among other issues, a discrete question of law: whether, for purposes of antitrust regulation, a parent company and its subsidiary may be treated as co-conspirators. A commentator has noted that the elements of a claim for conspiracy to monopolize have not been definitively identified. 2 Antitrust Laws § 26.02[1]. However, one may frame such a claim, it is clear nonetheless that a plaintiff must prove "a combination or conspiracy" in order to prevail. *Id.* § 26.02[2]. In other words, unilateral action is insufficient as a matter of law to prove a conspiracy, the essence of which is concerted action. *Id.*

Section 1 of the federal Sherman Act proscribes unreasonable restraints of trade implemented by a "contract, combination. . .or conspiracy" between separate entities. 15

7

U.S.C. § 1. In pertinent respects, this federal law is identical to 10 M.R.S.A. § 1101, which is not the basis for the plaintiff's conspiracy claim here. The Supreme Court has held that section 1 requires proof of concerted action between more than one actor. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 81 L.Ed.2d 628, 641 (1984). The *Copperweld* Court went on to conclude that, in a section 1 case, a parent company and its subsidiary cannot be regarded as separate actors. *Id.* at 771-77, 81 L.Ed.2d at 643-47. By express terms, the Court limited its holding to claims pursued under section 1 and thus impliedly reserved judgment on whether that conclusion would apply to section 2, which is the federal analogue to the plaintiff's conspiracy claim at issue here. *Id.* at 767, 81 L.Ed.2d at 640. Nonetheless, in the absence of definitive federal authority, the court here notes that the reasons why a parent and subsidiary are treated as a single entity in a section 1 case are equally applicable in a section 2 case:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder.

*Id.* at 771, 81 L.Ed.2d at 643. Thus, because of the identify of interests, the nature of the parent's control over the subsidiary and the other unique aspects of the relationship between two such entities, the goals that a legislature seeks to accomplish through a proscription of certain concerted conduct are not reached when that proscription is applied to the concerted action of a parent corporation and its subsidiary. *Cf. id* at 769, 81 L.Ed.2d at 641.

From a structural perspective, the applicability of the *Copperweld* analysis is apparent because, although the plaintiff's claim is brought under a provision comparable to section 2 of the Sherman Act, it invokes that part of the Maine statute that regulates conspiracies. Thus, to this extent, the construction of section 1 bears on the construction of that part of section 2 that controls concerted action (as opposed to other aspects of section 2 that control independent conduct). This, in fact, is the approach taken by many federal courts that have examined section 2. *See* 2 Antitrust Laws § 26.02[2] (". . .in deciding whether there is concerted action, courts routinely apply the same analysis under

8

both Sections 1 and 2. In numerous cases, court have addressed claims of conspiracies under Sections 1 and 2 without differentiating between the two sections as to the existence of concerted action.").

Thus, this court follows the lead of federal authority suggesting that a conspiracy to monopolize cannot exist between a parent company and its subsidiary. The court applies this principal to 10 M.R.S.A. § 1102. Because the plaintiff's conspiracy claim brought under section 1102 is predicated on a conspiracy between actors that stand in such a relationship, it fails as a matter of law.

The entry shall be:

For the foregoing reasons, the plaintiff's motion to amend is granted, and its second amended complaint is allowed.

The defendants' motion to dismiss is granted in part. Count 2 of the second amended complaint, alleging a conspiracy to monopolize, is dismissed for failure to state a claim on which relief can be granted. Beyond this, the motion to dismiss is denied.

With respect to the discovery dispute outlined in plaintiff's counsel's letter of February 25, 2005, Indeck shall not be required to produce the documents requested by the plaintiff. The court issues this protective order without prejudice to the plaintiff's right to renew it if the same material is not available from the defendants. The defendants shall produce the documents identified in paragraphs 1, 2 and 3 of the subpoena duces tecum. Such production may be made subject to a protective order or other confidentiality agreement as counsel may agree.

Dated: October 21, 2005

Justice, Maine Superior Court
Jeffrey L. Hjelm

9

THE ENVIRONMENTAL EXCHANGE INC VS CASELLA WASTE SYSTEMS INC ET AL
UTN:AOCSsr  -2005-0009469                    CASE #:BANSC-CV-2005-00025
-----------------------------------------------------------------------
THE ENVIRONMENTAL EXCHANGE INC                              PL
ATTY BLACKWELL, STEVEN  Tel# (207) 942-2898
ATTY ADDR:470 EVERGREEN WOODS BANGOR ME 04401


CASELLA WASTE SYSTEMS INC                                   DEF
ATTY WHITE, JEFFREY M.   Tel# (207) 791-1100
ATTY ADDR:ONE MONUMENT SQUARE PORTLAND ME 04101


NEW ENGLAND WASTE SERVICES OF ME INC                        DEF
ATTY WHITE, JEFFREY M.   Tel# (207) 791-1100
ATTY ADDR:ONE MONUMENT SQUARE PORTLAND ME 04101




M=More, Space = Exit:M

Select the EXIT KEY for page selection line.