**RAMALLO BROS. PRINTING, INC., Plaintiffs,**

v.

**EL DIA, INC.; Editorial Primera Hora, Inc., and Advanced Graphic Printing, Inc., Defendants.**

**No. CIV. 02–2400(JAF).**

United States District Court, D. Puerto Rico.

June 3, 2005.

*213.* Plaintiff opposes the motion. *Docket Document Nos. 176, 196.*

———

Allan Kanner, Conlee S. Whiteley, Allan Kanner and Associates, P.C., Lawrence J. Centola, Niles, Salas Bourque & Fontana, L.C., Camilo K. Salas, Salas & Co. L.C., Daniel E. Buras, Jr., Stewart E. Niles, Jr., New Orleans, LA, John F. Nevares, John F. Nevares & Assoc., PSC, San Juan, PR, for Plaintiffs.

Lee H. Simowitz, Mark A. Cymrot, Bruce W. Sanford, Elizabeth A. Scully, Robert D. Lystad, Ronald F. Wick, Baker & Hostetler LLP, Washington, DC, Andrew J. Durkovic, Baker & Hostetler LLP, Houston, TX, Salvador Antonetti–Zequeira, Roberto A. Camara–Fuertes, Ricardo F. Casellas, Fiddler, Gonzalez & Rodriguez San Juan, PR, for Defendants.

### *OPINION AND ORDER*

FUSTE, Chief Judge.

Plaintiff Ramallo Bros. Printing, Inc. ("Plaintiff") brings the present action against Defendants El Día, Inc. ("Defendant El Día"); Editorial Primera Hora, Inc. ("Defendant Editorial Primera Hora"); and Advanced Graphic Printing, Inc. ("Defendant AGP"); alleging violations of Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 (1997 & Supp. I 2003); Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, (1997 & Supp. I 2003); and various causes of action under state law, including the antitrust laws of the Commonwealth of Puerto Rico, 10 P.R. LAWS ANN. §§ 258, 260 and 268 (1997 & Supp.2001). *Docket Document Nos. 1, 13, 40.* Plaintiff seeks injunctive and monetary relief. *Id.*

Defendants move for summary judgment. *Docket Document Nos. 156, 189,*

## I.

### *Factual and Procedural Synopsis*

We derive the facts and allegations from our February 6, 2004, opinion and order, and from the parties' pleadings and statements of material fact. *Docket Document Nos. 1, 12, 13, 38, 40, 59, 156, 176, 188, 196.*

Plaintiff is a corporation organized and existing under the laws of Puerto Rico, with its principal place of business in Puerto Rico. It is a commercial printer whose business consists of, inter alia, the printing of inserts ("shoppers") advertising the sale of goods, which are distributed by inserting them in newspapers of general circulation in Puerto Rico, as well as by other means. Shoppers are used by major retailers, such as supermarkets, drug stores, toy stores, and furniture stores as advertising vehicles for products offered for sale. Shoppers usually range in size from four to twelve pages, and contain color pictures of individual products, together with prices and other product information.

Plaintiff is part of a group of businesses that also includes a commercial forms printer, a software integration business, a paper company, and a boat distributor, as well as a three-building industrial complex that includes leased space for commercial tenants and houses Plaintiff's printing facilities, which are located in what Plaintiff describes on its website as a "world-class manufacturing environment."

Defendant El Día is a corporation organized and existing under the laws of Puerto Rico with its principal place of business in Puerto Rico. Defendant El Día is the owner and publisher of *El Nuevo Día,* the largest newspaper in Puerto Rico based on paid circulation and revenues. The busi-

ness of the newspaper includes, inter alia, the distribution of shoppers printed by Defendant El Día, Defendant AGP, and other commercial printers, including Plaintiff. Defendant El Día is also part of a group of companies that includes Defendant Editorial Primera Hora and Defendant AGP, as well as other related businesses.

Defendant Editorial Primera Hora is a corporation organized and existing under the laws of Puerto Rico with its principal place of business in Puerto Rico. Defendant Editorial Primera Hora owns and publishes *Primera Hora,* a daily Puerto Rico newspaper, which is a new entrant into the daily newspaper market. *Primera Hora* is printed by Defendant El Día. Defendant Editorial Primera Hora's business also includes, inter alia, the distribution of a few shoppers.

Defendant AGP is a corporation organized and existing under the laws of Puerto Rico with its principal place of business in Puerto Rico. Defendant AGP is a commercial printing company that was formed by Defendant El Día in 1997. Defendant AGP's business, like that of Plaintiff, includes, inter alia, the printing of shoppers.

## A. *Newspaper Advertising in Puerto Rico*

*El Nuevo Día* and *Primera Hora* are two of four daily newspapers in Puerto Rico, all of which depend primarily on advertising for their revenues. Most retail newspaper advertising takes one of two forms: (1) display advertising that appears within the body of the newspaper, commonly referred to as "run of press" or ROP advertising, and (2) shoppers and other pre-printed inserts containing various types of advertising.

One vehicle for ROP advertising in *El Nuevo Día* and *El Vocero,* Puerto Rico's two largest newspapers, is commercial supplements, sections of the newspaper usually containing both editorial content and display advertising by multiple advertisers. *El Nuevo Día* publishes approximately 190 commercial supplements annually, including supplements published to commemorate Mother's Day, Christmas, and Secretaries' Week, or based on themes such as autos, weddings, and babies. *El Nuevo Día* produces and prints commercial supplements on newsprint using the newspapers' staffs and presses. According to its publisher, *El Vocero* follows the same practice for producing commercial supplements.

A small portion of commercial supplements, called "corporate supplements," focus on a featured business and usually celebrate that business' anniversary or some other special event. Corporate supplements constitute a negligible portion of the advertising and commercial printing business in Puerto Rico. From 1999 to 2003, *El Nuevo Día* had about 5,000 commercial inserts, but only 134 corporate supplements. Corporate supplements typically contain stories about a featured company and serve as a vehicle for the newspaper to sell advertising to sponsors, usually the featured company's vendors. Like commercial supplements, corporate supplements are produced entirely in-house. *El Nuevo Día* has designated Creative Minds, a former *El Nuevo Día* staff unit that is now a division of AGP, as its exclusive agent for producing corporate supplements, and it will only insert corporate supplements produced by Creative Minds. Creative Minds performs all the functions needed to produce the supplement, including preparation of editorial content and artwork, sales of advertising, coordination of the printing and insertion in the newspaper. Defendants' stated reasons for the policy of using only Creative Minds to produce corporate supplements are the need to maintain editorial

integrity, to ensure the content is accurate and comports with its style and content policies, and to take advantage of the cost savings.

Shoppers and corporate supplements are printed most frequently on glossy paper rather than newsprint, a process that requires the services of a commercial printer with a web press—such as Plaintiff and Defendant AGP—because glossy paper products cannot be printed on newspaper presses. Plaintiff complains that it printed *El Nuevo Día's* corporate supplements prior to Defendant AGP's formation, but *El Nuevo Día* will now only use Defendant AGP to print corporate supplements.

With four daily newspapers, three of which are separately owned, Puerto Rico has one of the most competitive newspaper markets in the United States. Only six other U.S. cities have more than two daily newspapers. Daily newspapers also compete with many other methods available for retailers to deliver their advertising messages to consumers. Plaintiff's vice-president for sales and many of the advertiser-deponents identified the media competing with daily newspapers as television, radio, magazines, direct mail, outdoor advertising, catalogues, coupons, the Internet, and the many regional newspapers in Puerto Rico. Shoppers are only one option for advertisers to deliver their message.

Those retailers that include shoppers in their advertising mix also use a variety of competing delivery channels to distribute their shoppers. While newspapers are the most common delivery means, some advertisers also use door-to-door delivery, direct mail, and free distribution in stores, malls, and other places.

**B.** *Competition Between Plaintiff and Defendant AGP*

In 1995, Plaintiff acquired a commercial printer in Puerto Rico that competed di-

rectly with Plaintiff in the printing of shoppers, effectively leaving Plaintiff as the only high-volume printer of shoppers located in Puerto Rico. According to Plaintiff's economics expert, Dr. Franklin M. Fisher, Plaintiff printed in excess of 80 percent of the shoppers produced in Puerto Rico before Defendant AGP entered the market.

In the early 1990s, El Día was a significant purchaser of commercial printing services for the printing of glossy magazines and other sections of its newspaper. El Día also printed some advertising material, including shoppers, on newsprint using the same presses it used to print the newspaper, but El Día did not have the presses necessary to print glossy paper products. El Día considered entering the printing business as early as 1992 because it witnessed an exodus of printing business to off-island printers. Believing that upward of 40 percent of commercial printing for the Puerto Rican market was being performed offshore, El Día decided to create AGP in 1997 to capture the offshore business and provide more competition within Puerto Rico.

Since Defendant AGP's formation, customers seeking lower prices and better service have moved regularly among printers. It has not been uncommon for advertisers to move their shopper business from Defendant AGP to Plaintiff, from Plaintiff to Defendant AGP, or back and forth on multiple occasions or to printers in other locations. A number of shoppers distributed in Puerto Rico are printed by printers located in the mainland United States and in the Dominican Republic. From 1999 to 2003, approximately 20 percent of the shoppers inserted into *El Nuevo Día* were printed by companies located outside Puerto Rico.

Within two years of its formation, Defendant AGP was printing 31 percent of

the shoppers inserted in *El Nuevo Día.* Its percentage rose to 36 percent in 2000 but has remained largely unchanged thereafter.[1] Plaintiff's share of inserts in *El Nuevo Día* moved in a range between a low of 37 percent in 2000 and 2003 to a high of 46 percent in 2001. The number of shoppers Plaintiff printed for insertion in *El Nuevo Día* increased by 63 percent between 1999 and 2003 and its revenues from all shoppers increased by 23 percent.

Even with the new competition from Defendant AGP, Plaintiff continues to advertise itself on its website as "the number one commercial printer in Puerto Rico and the Caribbean." *Printing Impressions,* which Plaintiff's website describes as "America's most influential journal for the printing and allied industries," ranks Plaintiff as 85th in 2004 among the top 400 printing companies in the United States— up from 166th in the 2001 rankings. Plaintiff's audited financial statements show, and its chief financial officer testified, that Plaintiff has been consistently profitable each year from 1998 through 2003, both company-wide and for printing shoppers. Plaintiff's profits from shoppers are substantially larger than industry averages, according to Plaintiff's printing expert, who testified that Ramallo's profits represented an average of 12 percent of shopper sales, compared to an industry-wide average for newspaper inserts of 5.4 percent. Plaintiff's chief financial officer testified that Plaintiff's net sales and stockholders' equity also were "considerably greater" in 2003 than they were in 1996, the year before Defendant AGP was formed.

Plaintiff remains the largest printer of shoppers in Puerto Rico based on revenue.

In 2003, Plaintiff reported approximately $18 Million in revenue from printing shoppers, compared to approximately $11.6 Million for Defendant AGP. Plaintiff today prints more shoppers than AGP and more than it did before Defendant AGP was formed.

Plaintiff's performance contrasts with Defendant AGP's struggles as a new entrant. While Defendant AGP was cash-flow positive prior to this lawsuit, it has only once shown a net profit. In February 2005, Defendant AGP laid off 20 percent of its work force and instituted other operational cost cuts in an attempt to improve its financial performance.

### C. *Defendants' Sales Practices*

Like other newspapers, both *El Nuevo Día* and *Primera Hora* give discounts to advertisers based on the volume of advertising they commit to the newspapers. Although newspapers publish rate cards showing rates for ROP advertising and for insertion of shoppers, advertisers testified that the rate card frequently serves as a starting point for negotiations between the newspaper and the advertiser. Plaintiff complains that sometimes the discounts for insertion services exceed 50 percent off rate card, but Plaintiff has not shown that these discounts are unusual, particularly for the large advertisers using shoppers in Puerto Rico, such as Wal–Mart, Pueblo, Walgreens, Pitusa, Sears, and J.C. Penney. Plaintiff admits that even with highly-discounted rates, Defendant El Día makes a substantial profit from the insertion of shoppers.

*El Nuevo Día* and *Primera Hora* insert shoppers without regard to the identity or location of the commercial printer that

---

1. Plaintiff has not offered market share information. Defendants have submitted figures showing the number of shoppers inserted in *El Nuevo Día.* These figures do not include shoppers distributed in other newspapers or by other means and, therefore, do not constitute complete market shares.

prints them. There is no evidence that either newspaper has ever refused to insert a shopper because it was printed by Plaintiff, or by any other commercial printer. Many of *El Nuevo Día*'s largest shopper insertion clients print shoppers with Plaintiff. Most advertisers that print with Defendant AGP negotiate with Defendant AGP separately from the newspapers. Defendants, however, have two programs in which an advertiser can receive a discount or other benefit from *El Nuevo Día* or *Primera Hora* based, in part, on the advertiser's use of AGP: Group contracts and other package discount arrangements, and a loyalty points program called "Alcance." Plaintiff's complaint focuses on these two programs. The programs are not mandatory; they are provided as an option to customers.

Defendants have entered into five group contracts with some advertisers that include prices for printing with Defendant AGP, as well as prices for shopper insertion or ROP advertising in *El Nuevo Día* or *Primera Hora*. These contracts contain incentives for the advertiser to print with Defendant AGP, such as a lower price for insertion or ROP advertising if the advertiser provides a minimum volume of printing business to Defendant AGP. Defendants have also offered package pricing for printing, insert and ROP advertising to some advertisers, but Plaintiff has not submitted evidence quantifying these arrangements. Printing and insertion services are, however, always separately available from Defendants.

Defendants' "Alcance" program allows customers to accumulate points by purchasing ROP advertising, insertion, commercial printing, and other services from Defendants and other affiliated companies. These points may be redeemed for services, such as advertisements in *El Nuevo Día* or *Primera Hora*. "Alcance" points may not be used, however, to purchase printing services from AGP. Some large advertisers do not receive "Alcance" points for their purchases because they negotiate for other price concessions.

### D. *Plaintiff's Allegations*

Plaintiff filed the present complaint on September 16, 2002, alleging the following seven causes of action: (1) conspiracy to unreasonably lessen and eliminate competition in the markets for the printing and delivery of shoppers and corporate supplements, in violation of Section 1 of the Sherman Act; (2) unreasonable restraint of trade in the printing and delivery markets, in violation of Section 1 of the Sherman Act; (3) attempt to monopolize the printing market, in violation of Section 2 of the Sherman Act; (4) conspiracy to monopolize the printing market, in violation of Section 2 of the Sherman Act; (5) monopolization and maintenance of monopoly power in the delivery market, in violation of Section 2 of the Sherman Act; (6) conspiracy to eliminate or injure competitors by misappropriating trade secrets and inducing competitors' employees to breach their employment contracts; and (7) violations of the antitrust laws of Puerto Rico. *Docket Document No. 1.* On November 5, 2002, Plaintiff filed an amended complaint alleging additional counts for violations of Puerto Rico's unfair trade practices law (count 8) and intentional interference with prospective economic advantages and business and contractual relationships under Puerto Rico law (count 9). *Docket Document No. 13.*

On November 13, 2002, Defendants moved to dismiss all counts 1 through 7, with the exception of count 3 as it pertained to corporate supplements, for failure to state a claim. *Docket Document No. 21.* Defendants also filed a counterclaim, alleging the following five causes of

action: (1) abuse of process under Puerto Rico law; (2) commercial disparagement under Puerto Rico law; (3) violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (4) tortious interference with contract under Puerto Rico law; and (5) violations of Article 1802 of the Civil Code of Puerto Rico, 31 P.R. LAWS ANN. § 5141. *Docket Document No. 12.* On November 21, 2002, Defendants filed a supplemental motion to dismiss counts 8 and 9 for failure to state a claim. *Docket Document No. 25.* Plaintiffs filed a second amended complaint on December 31, 2002. *Docket Document No. 40.*

On February 6, 2004, we granted Defendants' motion to dismiss counts 1, 4, and 6, finding that count 6 was time-barred and that Plaintiff's conspiracy claims failed because Defendants were commonly owned and controlled and, therefore, were legally incapable of conspiring with each other. We also dismissed count 8 insofar as it asserted claims under 10 P.R. LAWS ANN. § 259 (1997 & Supp.2001), and count 9 insofar as it asserted a claim for interference with prospective economic relationships. *Docket Document No. 59.*

Plaintiff's surviving claims are counts 2,[2] 3, 5, 7, 8 (insofar as it asserts claims under Article 1802 of the Puerto Rico Civil Code, 31 P.R. LAWS ANN. § 5141 (1991 & Supp.2001)), and 9 (insofar as it asserts a claim for tortious interference with business and contractual relationships). *Id.*

After exhaustive discovery that lasted more than a year, on March 1, 2005, Defendants moved for summary judgment. *Docket Document No. 156.* Plaintiff op-

posed the motion on April 4, 2005. *Docket Document No. 176.*

On May 13, 2005, Defendants voluntarily withdrew counts 2, 3, and 4 of the counterclaim. *Docket Document No. 204.* Defendants continue to maintain counts 1 and 5 of the counterclaim based on allegations that Plaintiff has used the lawsuit improperly to advance a plan to secure and maintain exclusive control over the commercial printing business in Puerto Rico. Plaintiff did not timely move for summary judgment against the counterclaim.

## II.

### Summary Judgment Motion Standard

The standard for summary judgment is straightforward and well-established. A district court should grant a motion for summary judgment "if the pleadings, depositions, and answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir.2004).

The moving party carries the burden of establishing that there is no genuine issue as to any material fact; however, the burden "may be discharged by 'showing' ... that there is an absence of evidence to

---

**2.** Defendants contend that count 2 was necessarily dismissed as a result of our ruling on February 6, 2004, because our ruling dismissed all conspiracy claims and count 2 alleges concerted action under Section 1 of the Sherman Act. Plaintiff contends that count 2 is a claim for an unlawful tying arrangement under Section 1 of the Sherman Act and,

therefore, the reasoning behind the dismissal of Plaintiff's other conspiracy counts does not apply. Because our discussion herein of Plaintiff's tying claims under Section 2 of the Sherman Act applies equally to a tying claim asserted under Section 1, we will treat count 2 as a surviving claim.

support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden has two components: (1) an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and (2) an ultimate burden of persuasion, which always remains on the moving party. *See id.* at 331, 106 S.Ct. 2548.

The non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment exists "to pierce the boilerplate of the pleadings and assess the proof in order to determine the need for a trial." *Euromodas, Inc. v. Zanella*, 368 F.3d 11, 17 (1st Cir.2004) (citing *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992)).

 "The Supreme Court has emphasized ... that summary judgment may be especially appropriate in an antitrust case because of the chill antitrust litigation can have on legitimate price competition." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 (7th Cir. 1989) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594–95, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). *See also PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 104 (2d Cir.2002) (summary judgment often appropriate in antitrust cases "because of the concern that protracted litigation will chill pro-competitive market forces"). Antitrust claims by competitors aggrieved by their rivals' low prices require critical examination, because those low prices benefit consumers, and consumer welfare is the primary concern of the antitrust laws. "Competition is a ruthless process. A firm that reduces cost

and expands sales injures rivals..... These injuries to rivals are byproducts of vigorous competition, and the antitrust laws are not balm for rivals' wounds... Thus the plaintiff faces a stiff burden in any [Sherman Act] § 2 litigation." *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir.1986). "Courts must be on guard against efforts of plaintiffs to use the antitrust laws to insulate themselves from the impact of competition." *Buffalo Courier–Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 55 (2d Cir.1979). Summary judgment is particularly appropriate where the non-moving party does not rely on disputed facts, but on unreasonable inferences. "[C]reditable inferences must rest on solid, fact-specific footings." *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1516 (1st Cir.1989).

### III.

### *Analysis*

#### A. *Attempted Monopolization*

 Plaintiff alleges that Defendants have attempted to monopolize the market for printing shoppers and corporate supplements in Puerto Rico by (1) unlawfully tying the printing of shoppers and corporate supplements to ROP advertising and insertion in *El Nuevo Día* and *Primera Hora*, (2) unlawfully "bundling" printing services with ROP advertising and insertion in Defendants' newspapers, and (3) predatorily pricing Defendants' printing and insertion services. *Docket Document No. 1*. To demonstrate attempted monopolization under Section 2 of the Sherman Act,[3] a plaintiff must generally show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a

---

**3.** Section 2 of the Sherman Act forbids any monopoly, or attempt to monopolize, or com-

bination or conspiracy to monopolize. 15 U.S.C. § 2.

specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). " '[A] dangerous probability of success in the relevant market ... requires evidence that the defendant had sufficient market power to have been reasonably able to create a monopoly.' ... A colorable claim, thus, must include evidence of the market power of the defendants and, therefore, must, like Section 1 claims, include facts defining the relevant market." *R.W. Int'l, Inc. v. Borden Interamerica, Inc.*, 673 F.Supp. 654, 657 (D.P.R.1987) (Fusté, J.) (internal quotes omitted).

## 1. *Dangerous Probability of Achieving Monopoly Power*

■ Defendants contend that Plaintiff has failed to show that Defendants have a dangerous probability of achieving monopoly power in the market for printing shoppers and corporate supplements in Puerto Rico. *Docket Document No. 156.* Plaintiff contends that Defendants' practices nearly drove Plaintiff into bankruptcy, and that only a substantial new contract in another line of business enabled Plaintiff to survive. *Docket Document No. 176.* Plaintiff further contends that Defendants' policy regarding corporate supplements has already foreclosed all corporate supplement business to Plaintiff, and that if Defendants' practices continue, Defendant AGP will drive Plaintiff out of the business of printing shoppers. *Id.* Plaintiff's attempted monopolization theory depends on the allegation that Defendants will drive it out of the shopper printing market and absorb its market share, thereby acquiring monopoly power.

### a. *Plaintiff's Financial Health*

In support of their motion, Defendants cite overwhelming and undisputed evidence that Plaintiff is healthy and viable and expects to remain so for the foreseeable future. *Docket Document No. 156.* Plaintiff has made a net profit from printing shoppers in every year since Defendant AGP was formed. Plaintiff's revenues from printing shoppers grew by more than 20 percent from 1999 to 2003 despite competition from Defendant AGP. Plaintiff's insertions in *El Nuevo Día*, the newspaper Plaintiff claims is attempting to drive it out of business, increased by 63 percent between 1999 and 2003. Plaintiff has recently gained significant new shopper clients, including Wal–Mart and J.C. Penney (from AGP) and Walgreens (from mainland U.S. printers). Plaintiff continues to derive more revenue from shoppers (approximately $18 Million in 2003) than Defendant AGP (approximately $11.6 Million).

Plaintiff's actions also reflect a financially and competitively healthy business, not a business on the brink of bankruptcy or exit from the printing market. Plaintiff has expanded and modernized its printing capacity with substantial investments in equipment since Defendant AGP entered the market, including the acquisition of three printing presses. Plaintiff submitted forecasted financial statements to its lender that predict steadily increasing sales and profits from 2004 through 2008. Plaintiff's chief financial officer and its outside auditor both testified that Plaintiff is a viable, healthy company, and that Plaintiff has made no plans or preparations to file for bankruptcy or discontinue the printing of shoppers. Plaintiff's chief executive officer directly contradicted his own company's case when he testified that he "cannot imagine" a time when Defendant AGP would be the sole printer of shoppers in Puerto Rico.

Plaintiff cites the testimony of its chief financial officer that, but for the addition

of a new contract in a different line of business (telephone directory printing), Plaintiff *might* have undergone a reorganization that *might* have led to bankruptcy. Given Plaintiff's consistent profitability and position in the market, such speculative and self-serving testimony could not persuade a reasonable finder of fact that Plaintiff was ever on the verge of failure.

Plaintiff also cites an analysis of its publicly-available financial statements performed by Defendant AGP in which Defendant AGP observed that Plaintiff's high-debt level had resulted in a weak cash-flow position. The same document, however, notes a marked improvement in Plaintiff's profitability, which is consistent with the testimony of Plaintiff's own executives. Moreover, Plaintiff's debt load resulted from its decision to develop a large industrial park project; any resulting negative effect Plaintiff's debt service obligations may have had on its cash flow cannot be attributed to Defendants' actions.

Finally, Plaintiff relies on the opinion of its economics expert, Dr. Franklin M. Fisher, whose report states incorrectly that Plaintiff is unprofitable. When presented with Plaintiff's audited financial statements, Dr. Fisher dismissed Plaintiff's history of consistent profitability, and testified instead that Plaintiff was not earning "economic profits" from shoppers, *i.e.,* that Plaintiff's profits do not represent a sufficient rate of return on its investment to provide Plaintiff's shareholders with an incentive to continue investing in the business. Dr. Fisher, however, did not calculate Plaintiff's "economic profits" for any year, testified that he lacked the information to do so, and has not provided any data to support his opinion. Plaintiff has not submitted any evidence that its profit margin on shoppers has decreased as a result of competition from Defendant AGP, and Plaintiff's printing expert opined that

Plaintiff's profits exceed the industry average. Dr. Fisher's report and testimony regarding Plaintiff's unprofitability is factually incorrect, and his testimony about economic profits is speculative and also inconsistent with the testimony of Plaintiff's printing expert. Dr. Fisher's opinion on this point is, therefore, rejected.

By every measure of financial performance, there is no risk that Plaintiff is about to be "eliminate[d]" from the market, as it alleges. The evidence on which Plaintiff relies, even when construed in the light most favorable to Plaintiff, is unpersuasive and implausible and creates no genuine issue of material fact. Plaintiff's contention that Defendants have a dangerous probability of achieving a monopoly in the printing market fails in the face of abundant and undisputed evidence of Plaintiff's financial health.

b. *Plaintiff's Market Strength*

■ Any analysis of dangerous probability of achieving monopoly power ordinarily includes an analysis of defendant's share of a properly defined relevant market. *See, e.g., Springfield Terminal Ry. v. Canadian Pac., Ltd.,* 133 F.3d 103, 107–08 (1st Cir.1997) (proof of defendant's high market share not "an inflexible requirement," but court should give "weight to the traditional requirement, and require exceptional circumstances before straying from it"). Despite the importance of this factor to the courts, Plaintiff has not undertaken market share calculations and professes ignorance of its own market share. The undisputed evidence submitted by Defendants regarding the printers of shoppers inserted in *El Nuevo Día* further supports the conclusion that there is no reasonable probability that Defendants will achieve a monopoly in printing shoppers.

There is no doubt that the business of printing shoppers has become more competitive since Defendant AGP entered the market. Plaintiff complains that Defendant AGP quickly took about 30 percent of the market. Plaintiff's expert, Dr. Fisher, however, testified that Plaintiff was printing more than 80 percent of the shoppers printed in Puerto Rico before Defendant AGP began competing for the business. The evidence submitted by Defendants shows that Defendants' share of inserts that appeared in *El Nuevo Día* remained roughly constant from 1999 through 2003, and more than 60 percent of the shoppers inserted in *El Nuevo Día* have been printed by printers other than Defendant AGP, which does not suggest any trend toward monopoly power on the part of Defendants.

■ Even if offshore printers are excluded from the market as Plaintiff argues, effectively leaving Plaintiff and Defendant AGP as the only participants in the relevant market, Defendants' market share would necessarily remain below 50 percent. Plaintiff's revenues from shoppers exceed Defendant AGP's revenues from shoppers and corporate supplements combined for each year from 1999 through 2003. A market share of less than 50 percent does not support a finding of dangerous probability of achieving a monopoly. *See, e.g., U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 1001 (11th Cir.1993) (no dangerous probability of success as a matter of law because defendant's market share below 50 percent at all relevant times); *Indiana Grocery,* 864 F.2d at 1414–15 (50 percent share insufficient where plaintiff conceded that defendant "could never control" market); *United States v. Empire Gas Corp.,* 537 F.2d 296, 305 (8th Cir.1976) (market shares of 50 percent and 47 percent insufficient for dangerous probability).

Plaintiff has not articulated any special circumstances that would lead us to forego the traditional reliance on market share analysis. On the contrary, the evidence of Plaintiff's continued financial strength and ability to compete vigorously confirms that Defendants do not have a dangerous probability of achieving monopoly power in the shopper printing market.

Plaintiff alleges that Defendant AGP will gain a market share in excess of 50 percent by eliminating Plaintiff and absorbing its market share. Plaintiff's financial strength refutes this suggestion. The First Circuit has also rejected this theory in *Springfield Terminal,* where the plaintiff, a much smaller and more precariously-positioned competitor than Plaintiff here, asked the court to assume that the defendant would force it into bankruptcy and acquire it:

> We would find attempt claims presumptively implausible if the challenged conduct has been in place for at least two years and the remaining market remains robustly competitive as evidenced by ongoing entry, profitability of rivals, and stability of their aggregate market share.

133 F.3d at 110 (quoting P. Areeda & H. Hovenkamp, FEDERAL ANTITRUST LAW, ¶ 807f, pp. 360–61). Here, Plaintiff remains profitable, and there is no evidence that its market share is declining. Thus, Plaintiff's claim is inherently implausible, and Plaintiff has provided no evidence to support its allegation that it is about to be eliminated from the printing market.

### c. *Plaintiff's Failure To Establish A Relevant Market*

As part of dangerous probability analysis, Plaintiff also has the burden to demonstrate a properly-defined relevant product and geographic market. *Fraser v. Major League Soccer, L.L.C.,* 284 F.3d 47, 61–62

(1st Cir.), *cert. denied,* 537 U.S. 885, 123 S.Ct. 118, 154 L.Ed.2d 144 (2002) (failure to prove relevant market "dooms [plaintiffs'] section 2 claims"); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182, 197 (1st Cir.1996). Plaintiff's expert, Dr. Fisher, argues that the relevant geographic market is limited to printers physically located in Puerto Rico, because the time and expense required to transport shoppers into Puerto Rico from other locations, as well as other considerations, render printers outside Puerto Rico poor substitutes for Puerto Rican printers.

We do not believe a finder of fact could rationally exclude from the relevant market printers located outside Puerto Rico that currently sell significant quantities of shoppers into Puerto Rico. Currently, approximately 20 percent of the shoppers inserted in *El Nuevo Día* are printed outside Puerto Rico, suggesting that offshore printers already compete substantially with Plaintiff and Defendant AGP. During the pendency of this lawsuit, a printer from the Dominican Republic successfully entered the market to print shoppers for distribution in Puerto Rico. Moreover, Dr. Fisher admits that if prices increased sufficiently, the presence of offshore printers could constrain prices charged by Puerto Rican printers. Finally, the record reveals substantial testimony from customers that have used or considered offshore printers, or would do so if prices increased in Puerto Rico.

Plaintiff's allegation that Defendants have a dangerous probability of achieving a monopoly in the printing of shoppers is devoid of evidentiary basis for three reasons: Plaintiff is a healthy, viable company that shows no signs of being eliminated as a competitor; Defendants' market shares do not reflect a risk that Plaintiff will be driven from the market; and

Plaintiff's definition of the relevant geographic market is too narrow. Plaintiff has the burden to prove each element of its attempted monopolization claim, or summary judgment is appropriate. *Springfield Terminal,* 133 F.3d at 107–10 (summary judgment warranted by "any fatal factual deficiency" in non-movant's case). Summary judgment is, thus, appropriate on the attempted monopolization claim.

**2. *Predatory or Anticompetitive Conduct***

Plaintiff also fails to meet its burden of creating a triable issue of material fact that Defendants engaged in any predatory or anticompetitive conduct. Plaintiff alleges three different types of anticompetitive conduct in support of its attempted monopolization claim: (1) unlawful tying, (2) unlawful bundling, and (3) predatory pricing. *Docket Document No. 1.*

■ In the tying and bundling claims, Plaintiff contends that Defendants' joint sales efforts—group contracts and other package discount offers and the "Alcance" program—are anticompetitive. "Package" sales, however, are widespread and ordinarily lawful. "Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). *See also Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 478–79, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)("It is undisputed that competition is enhanced when a firm is able to offer various marketing options, including bundling of support and maintenance service with the sale of equipment. Nor do such actions run afoul of the antitrust laws.") (footnote omitted); *SMS Sys.*

*Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 21 (1st Cir.1999). *See* Daniel A. Crane, *Multiproduct Discounting: A Myth of Nonprice Predation*, 72 U. Chi. L.Rev. 27, 28–29 (Winter 2005) ("Package discounting... is a pervasive phenomenon in the national economy, and one that produces substantial consumer benefits.") (footnote omitted).

Package sales are unlawful only in limited circumstances that Plaintiff has failed to show. The undisputed evidence demonstrates that Defendants have engaged only in a vigorous and lawful effort to compete with a dominant competitor in the commercial printing business.

*Tying.* Plaintiff contends that Defendants' offers of insertion and ROP advertising discounts to advertisers who print with Defendant AGP amounts to an unlawful tying of shoppers to insertion and advertising. *Docket Document No. 1.* Plaintiff further contends that Defendant El Día's policy of inserting only corporate supplements that are produced by a unit of Defendant AGP constitutes an unlawful tying arrangement. *Id.*

■ "Tying is not automatically unlawful under the antitrust laws ..." *Coady Corp. v. Toyota Motor Distribs., Inc.*, 361 F.3d 50, 60 (1st Cir.2004). To prove a per se tying violation, Plaintiff must prove that: (1) the tying and tied goods are two separate products; (2) the defendant affords consumers no choice but to purchase the tied product from it as a condition of obtaining the tying product; (3) the defendant has sufficient market power in the tying product market to distort consumers' choices with respect to the tied product; and (4) the tying arrangement forecloses a substantial volume of commerce. *United States v. Microsoft Corp.*, 253 F.3d 34, 85 (D.C.Cir.2001); *Borschow Hosp. and Med. Supplies, Inc. v. Cesar Castillo Inc.*, 96 F.3d 10, 17 (1st Cir.1996) (quoting *Data*

*Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1178 (1st Cir.1994)).

■ *Shoppers.* With respect to printing shoppers, the evidence is undisputed that the sale of advertising space or insertion of shoppers in *El Nuevo Día* is not conditioned on the purchase of printing from Defendant AGP. Dr. Fisher agrees that there is no evidence of what he calls "classic" tying arrangements with respect to shoppers. Plaintiff, however, contends that the second element of its tying claim—the coercion of advertisers to print shoppers with Defendant AGP—is met because Defendants allegedly coerce advertisers to use Defendant AGP by offering them discounts or lower prices on insertion and ROP advertising in the newspapers, as well as the accumulation of "Alcance" program points that can be redeemed at the newspapers. *Docket Document No. 176.* Plaintiff complains that it cannot offer the same types of discounts, but it has not quantified the discounts to which it objects; it has only submitted evidence of several examples of package offers that it contends are coercive.

■ To establish coercion the plaintiff must demonstrate that defendant's pricing structure "force[s] the buyer into the purchase of tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 814 (1st Cir.1988) (quoting *Jefferson Parish Hosp. Dist. No. 2*, 466 U.S. at 12, 104 S.Ct. 1551). *See also Kell v. Am. Capital Strategies Ltd.*, 278 F.Supp.2d 156, 161 (D.P.R.2003). The element of coercion, however, cannot be satisfied by mere discounts or other forms of package sales unless the combined purchase is the only economically-viable alternative. *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1113 (8th Cir.

1996) (products not tied unless package is "only viable economic option" and separate purchase is "prohibitively expensive"); *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F.Supp. 455, 471 (S.D.N.Y.1996) (collecting cases).

Plaintiff ignores this prevailing legal standard in the First Circuit and relies on a criticized and outdated Fourth Circuit opinion, *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55 (4th Cir.1969), for the proposition that any conditional discount on one product renders the sale of two products together a tying arrangement. Plaintiff would have this court find that related companies cannot lawfully enter into joint sales efforts involving package discounts. The court rejects this standard.

While Plaintiff repeatedly characterizes Defendants' package discount programs as coercive, it supports its claims with examples of advertisers that rejected Defendants' offers. This evidence misses the point. Defendants cannot be offering the "only viable economic option" (*Marts*, 77 F.3d at 1113) when advertisers frequently reject their offers. Defendants have submitted undisputed testimony from advertisers confirming that advertisers regularly reject group contracts offered by Defendants, other packages offered by Defendant AGP, and opportunities to accumulate "Alcance" points by printing with Defendant AGP. Not a single customer testified to being coerced to print with Defendant AGP in order to receive benefits from Defendants' newspapers. Defendants also have submitted undisputed evidence that 62 percent of all *El Nuevo Día* advertisers that inserted shoppers had them printed by Plaintiff and by other printers in the mainland or the Dominican Republic, not by Defendant AGP. The record also shows that Plaintiff has maintained an approximately constant share of major shopper accounts since 1999, including customers that it has won from Defendant AGP and customers who have turned down Defendants' package offers.

These facts demonstrate that buying advertising from *El Nuevo Día* without also buying printing services from AGP cannot have been "prohibitively expensive." Philip Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1758b (2d ed.2004) at p. 328 (no tying arrangement based on package discounts unless separate sales outside of package are below ten percent of total sales). *See also Ortho Diagnostic Sys.*, 920 F.Supp. at 472 (17 percent of revenue resulted from non-package sales; "This empirical evidence alone shows that the purchase [of these products from the defendant] at the unbundled prices was not economically prohibitive.").

Plaintiff has failed to produce any evidence that Defendants have coerced advertisers to print shoppers with Defendant AGP. What Plaintiff equates with coercion amounts to nothing more than normal competitive activity. Accordingly, we find that a reasonable finder of fact could not conclude that Defendants coerced advertisers with their discounts and, therefore, Plaintiff's tying claim with respect to shoppers fails.[4]

---

4. Plaintiff contends that Defendants have engaged in unlawful tying in violation of Section 1, and then argues that those tying arrangements support its attempted monopolization claims under Section 2 of the Sherman Act. *Docket Document No. 176.* The existence of two separate products and the presence of coercion are essential elements of an unlawful tying arrangement under Section 1 of the Sherman Act. If Plaintiff's tying claims fail under Section 1, then they cannot provide evidence for its attempted monopolization claims under Section 2.

**136**

■ *Corporate supplements.* With respect to corporate supplements, Defendant El Día has a policy that it will insert in the newspaper only corporate supplements produced by a unit of Defendant AGP. Plaintiff argues that this policy ties the distribution of corporate supplements, the tying product, with commercial printing by Defendant AGP, the tied product. *Docket Document No. 176.* Defendants assert that the policy does not satisfy the first and second elements necessary for a tying claim and is not anticompetitive. *Docket Document No. 156.* In addition, Defendants assert a First Amendment right to maintain the policy. *Id.* The court finds that Plaintiff has not established the elements of a tying claim and, therefore, will enter summary judgment against this claim.

■ Plaintiff makes a centerpiece of its case a *de minimis* part of the advertising and printing business in Puerto Rico. Plaintiff has not quantified the number of inserts it contends is printed within its alleged printing market, but Defendants have submitted undisputed evidence that of the 5,000 commercial inserts in *El Nuevo Día* in a five-year period only 134 were corporate supplements. Plaintiff has submitted evidence that one advertiser wanted to use Plaintiff to print its corporate supplement. Even Dr. Fisher concedes that *El Nuevo Dia's* corporate supplement policy, standing alone, does not have a significant anticompetitive effect. "The tying claim must fail absent any proof of anti-competitive effects in the market for the tied product." *Wells Real Estate,* 850 F.2d at 815. Plaintiff has failed to satisfy this burden.

Plaintiff also has failed to show the other elements of tying. Defendants contend that corporate supplements are not separate products, but rather two components of a single product—the preparation of a section of the newspaper. *Docket Document No. 156.* Corporate supplements are one of several vehicles Defendant El Día creates to sell advertising space, in this case to the featured company's sponsors. Plaintiff cannot distinguish corporate supplements from the newspaper's sports section or Defendant El Día's own glossy paper magazines that are printed by Defendant AGP and inserted into the newspaper. Each of these products contains editorial material, as well as advertising that generates most of the newspaper's income.[5] The newspaper pays the costs of producing corporate supplements, including creative work, insertion, advertising sales, and printing, from sponsors' advertising revenues, just as the cost of other sections of the newspaper are paid for largely from advertising revenues.

■ Two products exist for tying purposes only where there is substantial consumer demand for separate products. "[T]he answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish Hosp. Dist. No. 2,* 466 U.S. at 19, 104 S.Ct. 1551; *Data Gen. Corp.,* 36 F.3d at 1179 (internal quotations omitted). The evidence does not support a finding of such separate demand. Since the newspaper is paying

---

5. Corporate supplements, thus, resemble other advertising vehicles as to which courts have rejected tying claims that attempted to split integral components of those vehicles into tied and tying products. *Hirsh v. Martindale–Hubbell, Inc.,* 674 F.2d 1343, 1347 (9th Cir.1982) (advertising in legal directory and requirement to purchase copy of directory single product); *RFD Publ'ns, Inc. v. Oregonian Publ'g. Co.,* 749 F.2d 1327, 1327 (9th Cir. 1984) (sale of newspaper advertising and advertising mailed to non-subscriber's single product).

the costs for the corporate supplements, the featured business is not purchasing printing or any of the other services needed to produce the corporate supplement and therefore is not providing a demand for printing. Even if the featured business were considered a printing customer, Plaintiff has not produced sufficient evidence for a reasonable fact finder to conclude that the printing of corporate supplements constitutes a separate product.

■ For the same reason, Plaintiff cannot prove that Defendants coerce featured businesses to purchase printing from Defendant AGP. Because *El Nuevo Día* corporate supplements are financed through advertising revenues from the supplement, the featured business does not purchase printing, and thus it is not coerced to purchase any product. The absence of a coerced purchase defeats any possibility of an unlawful tying arrangement. *Jefferson Parish Hosp. Dist. No. 2,* 466 U.S. at 12, 104 S.Ct. 1551. ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the *buyer* either did not want at all, or might have preferred to purchase elsewhere on different terms.").

Defendant El Día's right to control the editorial content and preparation of corporate supplements is also protected by the First Amendment. Would-be advertisers have no right to compel a newspaper to accept their advertisements, let alone editorial material. "The [advertiser's] right to free speech does not give it the right to make use of the defendants' printing presses and distribution systems without defendants' consent." *Chicago Joint Bd., Amalgamated Clothing Workers of Am. AFL–CIO v. Chicago Tribune Co.,* 435 F.2d 470, 478 (7th Cir.1970). *See also Person v. New York Post Corp.,* 427

F.Supp. 1297, 1301 (E.D.N.Y.1977) (claim that newspaper could be ordered to carry plaintiff's advertisements "runs squarely against the wall of freedom of the press"). *El Nuevo Día* has chosen to maintain editorial and business control over corporate supplements by assigning their production to Creative Minds, formerly an *El Nuevo Día* staff unit that was transferred to Defendant AGP. This approach ensures the newspaper that the content of corporate supplements is accurate and comports with its style and content policies.

■ Plaintiff acknowledges that corporate supplements are an editorial product; it contends, however, that Defendant El Día can maintain editorial control even while Plaintiff prints the corporate supplements, as it did prior to the creation of Defendant AGP. The newspaper's right to control editorial content, however, extends to how editorial materials are prepared. In *Miami Herald Publ'g Co. v. Tornillo,* the Supreme Court said that the government is prohibited from imposing a penalty "in terms of the cost in printing and composing time and material and in taking up space that could be devoted to other material the newspaper may have preferred to print." 418 U.S. 241, 256, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). Requiring the newspaper to engage an outside printer, when it can use an affiliated company, would impose unnecessary costs on the newspaper that would violate its First Amendment rights.

Accordingly, summary judgment will be entered against Plaintiff's tying claim regarding corporate supplements.

*Bundling.* Plaintiff claims that when Defendants offer financial incentives—such as group contracts and the "Alcance" program—to encourage advertisers to print shoppers with AGP, these incentives constitute unlawful bundling. *Docket Document No. 176.* Defendants contend that

their joint selling practices are widely used, pro-competitive, and lawful. The court agrees with the Defendants.

■■■ Although few cases have addressed bundled pricing as a potential antitrust violation, one requirement is clear: The challenged prices must have the effect of excluding a single-product competitor. *See* P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 749 (2d ed. 2004 Supp.) at p. 182–83 ("[A] requirement that the bundling practice be sufficiently severe to exclude an equally efficient single-product rival, and without an adequate business justification, seems to strike about the right balance between permitting aggressive pricing while prohibiting conduct that can only be characterized as anticompetitive."). In *Ortho Diagnostic Systems,* summary judgment was granted against the plaintiff, a single-product competitor, because the plaintiff was indisputably able to compete profitably against the multiproduct defendant, despite the defendant's bundled pricing. "The fact [that the plaintiff was profitable] is highly significant. . . . [O]nly price cutting that threatens equally or more efficient firms is condemned under Section 2." [The plaintiff must prove] "that the defendant's pricing makes it unprofitable for the plaintiff to continue to produce." 920 F.Supp. at 469–70.

■■■ Here, far from being excluded, Plaintiff has indisputably experienced consistent and increasing profits and sales during the seven years of Defendant AGP's existence, and Plaintiff consistently makes the largest volume of shopper sales in the alleged market. Plaintiff has provided no evidence of the amount of print-ing sales subject to bundling, the amount of printing sales it claims to have lost as a result of specific bundled contracts, or how any discounts or benefits offered in any group contract actually caused Plaintiff's loss of sales. Without specific data on the specific sales allegedly lost by Plaintiff subject to group contracts by Defendants, and without evidence that those sales were lost because of bundled pricing, Plaintiff has not demonstrated antitrust injury. *Virgin Atl. Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 271 (2d Cir.2001) (requiring evidence showing "what percentage of bundled sales actually included one of the five routes at issue. . . . which of these flights were bundled with more competitive transatlantic routes, what prices were paid on the bundled flights, what costs were incurred, and whether [the defendant] realized sufficient profits to cover the alleged losses on the transatlantic flights").

Nor has Plaintiff shown that bundled discounts had a coercive effect on any customer. *Virgin Atl. Airways Ltd.,* 257 F.3d at 270 (noting absence of "exhibits showing that specific customers felt compelled to purchase products under the defendant's bundling program because the plaintiff could not match the discounts"). Rather, Plaintiff's continued ability to outsell Defendants, together with the substantial evidence of customers who have rejected Defendants' group contracts and "Alcance" program offers to print with Plaintiff, demonstrate that these practices have had no discernible exclusionary effect on Plaintiff. In the absence of such an effect, Plaintiff's bundling claim necessarily fails.[6]

---

**6.** *LePage's Inc. v. 3M,* 324 F.3d 141 (3d Cir. 2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 2932, 159 L.Ed.2d 835 (2004), relied on by Plaintiff, is inapposite. The single-product plaintiff in *3M* was unable to compete with the defendant's multi-product discounts: The

plaintiff's "healthy operating income" fell and became "large operating losses," its sales and its market share declined, and it closed one of its two plants. 324 F.3d at 161–62. Here, Plaintiff has been profitable, its shopper sales have increased, its market share has re-

***Predatory Pricing.*** Plaintiff alleges that Defendants have engaged in predatory or below-cost pricing of shopper printing and insertion services. *Docket Document No. 1.* The undisputed material facts fail to bear out this claim.

An attempted monopolization plaintiff basing its claims on predatory pricing must establish "two prerequisites to recovery" under *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). First, the prices complained of must be "below an appropriate measure of [the defendant's] costs." *Id.* at 223, 113 S.Ct. 2578. Second, recoupment must be probable; the alleged predator must have the ability to eliminate its competition and then recover its losses through future high prices. *Id.* at 224, 113 S.Ct. 2578.

Although the Supreme Court has not specified the "appropriate measure" of cost in a predatory pricing case, the generally accepted standard in the First Circuit and most other circuits is whether a seller's prices exceed its incremental (or marginal) cost: "*[O]rdinarily* the measure of a 'predatory price' is price below 'incremental cost.' ... that is to say, the addition to total cost (to the firm) of producing and selling additional output would exceed the return from selling that additional output." *Clamp–All Corp. v. Cast Iron Soil Pipe Inst.,* 851 F.2d 478, 483 (1st Cir.1988) (Breyer, J.) (emphasis original; citation omitted). *See also Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 232 (1st Cir.1983) (Breyer, J.).

Incremental or marginal cost is difficult to measure. The First Circuit and most other circuits, therefore, rely on average variable cost (those costs that change as output changes) as an approximation of incremental cost. In the First Circuit and most others, variable cost is "the normal test of predation[.]" *Tri–State Rubbish, Inc. v. Waste Mgmt., Inc.,* 998 F.2d 1073, 1080 (1st Cir.1993). *See also Stearns Airport Equip. Co. v. FMC Corp.,* 170 F.3d 518, 532 (5th Cir.1999); *Morgan v. Ponder,* 892 F.2d 1355, 1360 (8th Cir.1989); *Northeastern Tel. Co. v. American Tel. & Tel. Co.,* 651 F.2d 76, 88 (2d Cir.1981).

Because the antitrust laws seek to promote vigorous price competition resulting in low prices, "[w]e must be mindful that low prices are a positive aspect of a competitive marketplace and are encouraged by the antitrust laws." *Virgin Atl. Airways Ltd.,* 257 F.3d at 269. Courts, therefore, carefully scrutinize attempted monopolization claims based on predatory pricing. "The requisites for proving predatory pricing are demanding, because the conditions under which it is plausible are not common, and because it can easily be confused with merely low prices which benefit consumers." *Tri–State Rubbish, Inc.,* 998 F.2d at 1080. *See also Virgin Atl. Airways Ltd.,* 257 F.3d at 266 ("[T]he Supreme Court has expressed deep skepticism regarding the viability of proving a predatory pricing scheme."); *Stearns Airport Equip. Co.,* 170 F.3d at 527 (same); *Bathke v. Casey's Gen. Stores, Inc.,* 64 F.3d 340, 343 (8th Cir.1995) (same).

Defendants have presented an analysis by an accounting expert that concludes that Defendant AGP did not price below average variable cost during the 1999–2003 period, *i.e.,* that Defendant AGP main-

mained constant, and it has added new production capacity. Moreover, in *3M,* the defendant was an admitted monopolist that used its multi-product discounts to prevent the plaintiff from successfully entering the mar-

ket. *Id.* at 159–60. Here, Defendant AGP was a new entrant and Plaintiff was the dominant incumbent, whose market share prior to AGP's entry was in excess of 80 percent.

tained a positive "contribution margin"—revenues less variable costs—for its shopper printing business throughout that period. Plaintiff responded with an analysis by its economic expert, Dr. Fisher, that examined transactions with particular customers of Defendant AGP, and (among other things) treated discounts granted to those customers by Defendants El Día and Primera Hora as deductions from Defendant AGP's revenues. Even with those recalculations, however, Dr. Fisher still concluded that Defendant AGP had a 21–percent positive contribution margin for the shopper customers he examined using one methodology, and a 26–percent positive contribution margin for the shopper customers he examined using an alternative methodology. It is, therefore, undisputed that Defendant AGP priced above its average variable costs in its overall shopper printing business.

■ Dr. Fisher also concluded that a limited number of printing jobs, representing 10 percent of Defendant AGP's sales by one methodology, and 8 percent of Defendant AGP's sales by an alternative methodology, were priced below its average variable costs. Even if Dr. Fisher is correct, claims of below-cost pricing on a small percentage of a firm's sales are insufficient to raise a triable issue of predatory pricing. Predation claims cannot be based on occasional instances of allegedly predatory pricing, because they are not likely to drive rivals from the market and to permit the predator to raise prices and profits subsequently. A predatory pricing plaintiff can prevail only by adducing "evidence suggesting defendants' *overall* price structure was predatory," not that a small minority of sales were below average variable cost. *Morgan*, 892 F.2d at 1361 (emphasis original). *See also Stearns Airport Equip. Co.*, 170 F.3d at 529 ("[The plaintiff] has introduced no evidence that its survival is threatened by the sales lost to the rare, sporadic predation that it allege[s]."); *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 478 (5th Cir.2000) (alleged predatory pricing too limited to exclude competitor); *Springfield Terminal*, 133 F.3d at 109 (one example of below-cost pricing insufficient).[7]

■ Dr. Fisher also computed the portion of Defendant AGP's sales that he asserted was below average *total* cost, *i.e.*, the extent to which Defendant AGP's revenues did not cover both its variable and fixed costs. Sales below average total cost (in other words, whether a firm has a bottom-line net loss) are irrelevant to predatory pricing analysis in the First Circuit and the majority of other circuits that have adopted the average variable cost standard. *Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc.*, 735 F.2d 884, 891, 892 (5th Cir.1984) ("costly error" for plaintiff to interpret statement that defendant "had suffered 'a net loss from opera-

---

7. Plaintiff also argues that Defendant AGP charged prices below average variable cost to certain customers when it first entered the market in 1997, and shortly thereafter. *Docket Document No. 176.* Promotional discounts by new entrants, however, are not regarded as predatory. "Unless continued over a long period of time, in which case it is no longer promotional, promotional pricing by new entrants ... [is] no threat to competition.... Under these circumstances courts find promotional prices lawful, no matter what that price-cost relationship." III Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 492 (2002) (footnote omitted). *See also Am. Academic Suppliers, Inc. v. Beckley–Cardy, Inc.*, 922 F.2d 1317, 1322 (7th Cir.1991) ("It is commonplace for new entrants to use deep discounts to persuade customers to switch from established firms. These promotional discounts raise no antitrust problems...., though often they are below incremental cost in a superficial sense."). Moreover, Defendant AGP's general manager in 1997–1998, in testimony offered by Plaintiff, said that the company never priced below cost.

tions' to be effectively an admission of predatory pricing;" plaintiff erroneously ignored "the difference between a net operating loss and a price below average variable cost"); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F.Supp.2d 718, 734–35 (D.Md.2002) (summary judgment on predation claim that newspaper's losses were funded by parent company; "Simply losing money is not a 'pricing policy.'"), *aff'd*, 73 Fed.Appx. 576 (4th Cir.2003).[8]

### 3. *Specific Intent to Monopolize*

A final requirement of an attempted monopolization claim is evidence that the defendants had a "specific intent to destroy competition or build monopoly[.]" *Times–Picayune Publ'g Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). Evidence of a mere desire to increase market share or win customers from a competitor does not suffice. *E.g., Spectrum Sports, Inc.*, 506 U.S. at 459, 113 S.Ct. 884 ("the necessary intent to monopolize ... is something more than an attempt to compete vigorously").

Plaintiff has not shown that any of Defendants' conduct evidences an intent to monopolize the printing market. Plaintiff's principal evidence of intent consists of an affidavit from Defendant AGP's first general manager for the proposition that shortly before Defendant AGP was formed, Defendant AGP hired some of Plaintiff's employees with the knowledge that doing so would harm Plaintiff.

This testimony, however, does not establish an intent to monopolize the printing market. Predatory hiring cases must be proved by a showing that the hiring "was made with such predatory intent, *i.e.*, to harm the competition *without helping the [defendant]*, or by showing a clear nonuse in fact." *Universal Analytics, Inc. v. MacNeal–Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir.1990) (emphasis added). Here, it is undisputed that Defendant AGP did use the employees who formerly worked for Plaintiff, and the affidavit acknowledges that hiring the employees benefited Defendant AGP by providing it with skilled employees who would not need to be trained.

Thus, Plaintiff has failed to demonstrate that Defendants had a specific intent to monopolize the printing market.

### B. *Monopolization*

Plaintiff also alleges that Defendant El Día has monopolized the market for the delivery of shoppers in Puerto Rico. *Docket Document No. 1*. Plaintiff has failed to raise a triable issue with regard to this claim, and summary judgment is, therefore, appropriate.

The offense of monopolization under Section 2 of the Sherman Act requires proof that the defendants (1) have acquired a monopoly in the relevant market and (2) have willfully acquired or maintained that monopoly power. *Eastman Kodak Co.*, 504 U.S. at 481, 112 S.Ct. 2072 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)).

As a threshold matter, Plaintiff lacks standing to assert an antitrust claim for monopolization of the market for the

---

8. In its complaint, Plaintiff also alleges that Defendant El Día engaged in below-cost pricing of insertion services in the newspaper. *Docket Document No. 1*. Plaintiff subsequently contended that Defendant El Día's above-normal profits on insertion proved that it possessed market power. *Docket Document No.*

176. Those two positions are inconsistent. Defendants' accounting expert concluded that Defendants priced above average variable costs for insertion services, and there is no genuine dispute that Defendants' insertion pricing was not below any relevant measure of cost.

delivery of shoppers. A private antitrust plaintiff must show "antitrust injury," or "injury of the type the antitrust laws were intended to prevent[.]" *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Plaintiff is neither a consumer nor a competitor in the delivery market; Plaintiff neither advertises through the use of shoppers nor does it deliver shoppers to consumers in competition with Defendants. "Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999).

Even if it had standing, Plaintiff has not presented a triable issue as to whether Defendants possess monopoly power in a relevant market. Plaintiff contends that the relevant market is limited to the delivery of shoppers through newspapers of general circulation in Puerto Rico. Plaintiff excludes all other forms of advertising and other methods of delivering shoppers from its market definition. There are three competing newspaper companies in Puerto Rico that operate four daily newspapers: *El Nuevo Día* and *Primera Hora* (which are under common ownership with Defendants), *El Vocero*, and the *San Juan Star*. Plaintiff's complaint alleges that each of these newspapers is in the shopper delivery market. *Docket Document No. 1.* It is unusual in the United States for cities with populations larger than Puerto Rico to have three independently-owned competitive daily newspapers. Plaintiff has not presented evidence to support the hypothesis that Defendants have monopoly power in shopper delivery despite the presence of two other competing newspapers also available to shopper advertisers.

█ It is also undisputed that shoppers are delivered to consumers in Puerto Rico by methods other than insertion in daily newspapers. Those other methods include house-to-house delivery, direct mail, and in-store distribution. While these methods may not be perfect substitutes for newspaper delivery, it is undisputed that numerous advertisers use them to distribute significant numbers of shoppers in Puerto Rico. Wal–Mart, for instance, delivers only 15 percent of its shoppers through newspapers. It is also undisputed that firms exist in Puerto Rico that specialize in such alternative delivery methods, including at one time a firm owned in part by Plaintiff itself. Barriers to entry for such firms appear to be low. *See Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1200 (3d Cir. 1995). Once again, Plaintiff has excluded from its market definition competitors that are already competing in the market. Courts are reluctant to confine markets for delivery of particular types of advertising to a single method, given the variety of alternatives ordinarily available. *Menasha Corp. v. News America Mktg. In-Store, Inc.*, 354 F.3d 661, 664 (7th Cir. 2004) ("The number of ways to promote a product is large, and even a stranglehold over at-shelf coupon dispensers would affect only a tiny portion of these means."). Plaintiff's market definition is, thus, too narrow.

Finally, Plaintiff does not identify evidence of anticompetitive conduct by the Defendants that constituted the willful acquisition or maintenance of monopoly power in the alleged delivery market. There is no evidence that Defendants took any action that reduced competition either among daily newspapers, or among alternative shopper delivery methods such as direct mail, house-to-house delivery, and in-store distribution.

### C. *Violations of Puerto Rico Antitrust Laws*

█ Plaintiff alleges that Defendants also have violated the antitrust laws of

Puerto Rico, 10 P.R. Laws Ann. §§ 258, 260 and 268 (1997 & Supp.2001). *Docket Document No. 1.* Puerto Rico's antitrust laws, however, mirror the federal antitrust statutes. *See Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182 (1st Cir.1996); *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.,* 332 F.3d 6, 16 (1st Cir.2003); *Leopoldo Fontanillas, Inc. v. Luis Ayala Colon Sucesores, Inc.,* 283 F.Supp.2d 579, 592 (D.P.R.2003). Plaintiff bases its Puerto Rico law antitrust claim on the same allegations that serve as the basis for its federal law antitrust claim. Accordingly, for the same reasons Plaintiff's federal antitrust claims fail as a matter of law, Plaintiff's Puerto Rico law antitrust claim also fails as a matter of law.

## D. *Unfair Trade Practices*

 Plaintiff also asserts a claim for unfair trade practices under Article 1802 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5141 (1991 & Supp.2001). *Docket Document No. 1.* The elements of a claim under Article 1802 are (1) proof of the reality of the damage suffered; (2) a causal relationship between this damage and the action or omission of another person; and (3) said act or omission is negligent or wrongful. *Woods–Leber v. Hyatt Hotels of Puerto Rico, Inc.,* 951 F.Supp. 1028, 1035–36 (D.P.R.1996).

Plaintiff has not established that Defendants committed any negligent or wrongful acts. On the contrary, we have found that Defendants have engaged in legitimate competition as a matter of law. Accordingly, Plaintiff cannot prove that any of Defendants' conduct constitutes an unfair trade practice under Article 1802.

## E. *Tortious Interference*

 Plaintiff also asserts a claim for tortious interference with business and contractual relationships. *Docket Document No. 1.* To establish such a claim, Plaintiff must show: "(1) the existence of a contract; (2) that the interfering party acted with intent and knowledge of the existence of a contract; (3) that plaintiff suffered damages; and (4) that there exists a causal link between the injury and the interfering party's actions." *Fontanillas,* 283 F.Supp.2d at 588 (citing *General Office Prods. Corp. v. A.M. Capen's Sons, Inc.,* 115 D.P.R. 553, 558–59 (1984)). Moreover, when the contract allegedly interfered with is terminable at will, "the privilege of competition has been recognized. In such a case, there is no contract right to have the relation continued, but only an expectancy," which is not actionable. *Id.* (quoting *Dolphin Int'l of Puerto Rico v. Ryder Truck Lines,* 127 D.P.R. 869, 883 (1991)).

Here, Plaintiff has not identified any specific contract that Defendants are alleged to have interfered with, let alone evidence from which a finder of fact could determine whether any such contract was terminable at will. Instead, Plaintiff relies on the general assertion that "shopper printing is handled mainly on a contract basis," *Docket Document No. 176,* and identifies specific accounts that it claims Defendants "targeted," in some cases unsuccessfully. *Id.* Because Plaintiff and Defendant AGP are competitors, that Defendant AGP gained customers from Plaintiff is neither surprising nor unlawful. Even if the customers taken by Defendant AGP had contracts with Plaintiff—which Plaintiff has not established—the burden is on Plaintiff to show that the contracts were in effect when the customer switched printers, that the contracts were not terminable at will, and that Defendant AGP was aware of the existence and non-terminable nature of the contracts. Plaintiff has made no such showing.

Finally, Plaintiff relies on evidence of Defendant AGP's hiring of Plaintiff's employees in 1997 in support of its tortious interference claim. We previously dismissed Plaintiff's predatory hiring claim as barred by the statute of limitations, *Docket Document No. 59,* and need not revisit the claim here.

## IV.

### *Conclusion*

This case falls into the category of antitrust actions against which the Supreme Court warned: It has been brought by a dominant competitor against a new entrant and has had potentially-serious anticompetitive effects. The record includes depositions from fifteen advertisers who have testified to the pro-competitive impact of having a new commercial printer in Puerto Rico. Plaintiff's case, by contrast, has been marked by legal theories that conflict with controlling Supreme Court and First Circuit precedents, and factual allegations unsupported by any facts or based upon implausible inferences.

In accordance with the foregoing, we **GRANT** Defendants' summary judgment motion as to all remaining counts of the complaint. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**